CASE 29—ELECTION CONTESTS BY W. R. MILWARD
AGAINST JOHN SKAIN, BY ALAN P. GILMOUR
AGAINST WALLACE MUIR, BY JOHN L. STEPHAN-
SKI AGAINST JOHN W. MASNER AND BY R. J. Mc-
MICHAEL AGAINST JOHN F. DOYLE.—April 21,
1910.

## Skain v. Milward.

Appeal from Fayette Circuit Court.

Watts Parker, Circuit Judge.

Judgment for contestants, contestees appeal.—Re-
versed.

1.  Elections—Election Precincts—Statutes.—The statute, pro-
    viding that each election precinct shall contain, as nearly as
    practicable, 300 votes, based on the number cast at the
    last presidential election, and that no precinct shall contain
    more than 350 votes, and that if at any election more than
    350 votes shall be cast at any voting place. the sheriff of
    the election at the precinct shall report the same to the
    county court, which shall divide the precinct, make the size
    of a precinct depend on the votes cast at the last presi-
    dential election, and a county judge establishing precincts
    is not authorized to take a poll, but must act according to
    the votes cast at the last presidential election, and where
    he in good faith does so, the fact that some of the precincts
    established by him contain more than 350 votes does not
    render the election void.
2.  Elections—Regulations—Statutes—Booths.—Ky. St. section
    1467, providing that the number of booths shall not be less
    than one for every 100 voters, and one for every fraction
    of 100 exceeding 50, who voted at the last preceding election
    in such precinct, fixes the number of booths according to the

number who voted at the last election in the precinct, and where precincts were established since the preceding election, the sheriff in providing for the booths can only be guided by the presumption that the county judge has done his duty, and he is only required to put in three booths in each precinct; and, where the sheriff followed the statute, and no one applied to him for more booths, no one can complain because the sheriff did not put in a requisite number of booths as shown by the number of votes cast at the election.

3   Elections—Free and Equal Elections—Evidence.—In proceedings to contest a city election, evidence held not to show such a denial of the right to vote as to justify a finding that the election was not free and equal.

4   Elections—Free and Equal Elections—Election Officers—Representation of Parties.—The fact that the election commissioners appointed, as election officers in each election precinct of a city for a city election, a Democratic judge and a Republican judge, a Democratic clerk, and a Republican sheriff did not show that the election was not free and equal under the statute, which merely requires that the officers of election be equally divided between the political parties without requiring such offices to be alternated between the parties, for both the clerk and the sheriff under the statutes have important functions to perform in an election.

5.   Elections—Election Officers—Duties.—Under Ky. St. section 1484, requiring the sheriff of each precinct to preserve order at the polls and enforce the election law under the direction of the judges, he does not, except under the direction of the judges, run the election.

6.   Elections—Election Officers—Duties.—Under Ky. St. section 1585A, subsec. 15, prohibiting the unlawful interference with the officers of election in the discharge of their duties, etc., a peace officer may not interfere with an election officer in the discharge of his duties, and he should not take any part in maintaining order within 50 feet of the polls, unless it is necessary to preserve the peace, or he is required to do so by the sheriff, but he may, when so requested, assist in maintaining order.

7.   Elections—Contests—Illegal Votes—Burden of Proof.—A contestant in an election contest, who alleges that illegal votes were cast, must show for whom the illegal votes were cast, for without that it cannot be known that contestant was prejudiced thereby.

8    Elections—Contests—Illegal Votes—Evidence.—In an election
     contest, based on illegal votes, an illegal voter may be re-
     quired to show how he voted.

9.   Elections—Contests—Bribery—Evidence.—The fact that the
     Republican campaign committee spent $3,300, and that the
     Democratic campaign committee spent $3,100, in a city elec-
     tion in the city of Lexington, did not show that an improper
     amount of money was used in the election sufficient to justify
     the court in setting aside the election on the ground of
     bribery.

10.  Elections—"Bribery" of Voters.—Since under the Ky. St. sec-
     tion 1488, a voter cannot vote unless he presents to the elec-
     tion officers his certificate of registration, the buying of cer-
     tificates to prevent voters from voting is the buying of per-
     sons not to vote, and is "bribery" under section 1596A, sub-
     sec. 12, prohibiting bribery.

11.  Elections—Validity—Presumptions—Burden of Proof. — The
     burden of proof is on the contestant in an election contest
     to show such fraud, intimidation, bribery, or violence in the
     conduct of the election that neither candidate can be adjudged
     to have been fairly elected.

S. M. WILSON, GEO. S. SHANKLIN, McQUOWN & BECKHAM,
A. J. CARROLL, G. ALLISON HOLLAND and GEORGE C. WEBB
for appellants.

SHELBY & SHELBY, FALCONER &  FALCONER, D. GRAY
FALCONER, BUTLER T. SOUTHGATE  and CHARLES  KERR
for appellees.

OPINION OF THE COURT BY JUDGE HOBSON—Revers-
ing.

At the election held on November 5, 1907, in the
city of Lexington, appellant John Skain and ap-
pellee W. R. Milward, Sr., were    candidates   for
mayor; appellant Wallace Muir and appellee A. P.
Gilmour were candidates for city attorney; appellant
John F. Doyle and appellee R. J. McMichael  were
candidates for city assessor, appellant John W. Mas-
ner and appellee John L. Stephanski were  can-
didates for city jailer, as the nominees respectively

of the Democratic and Republican parties. On the face of the returns Skain received a majority of 628 votes, Muir, 778, Doyle, 754, and Masner, 812. Their election was contested by their opponents. A large mass of evidence was taken. On the submission of the case to the circuit court it was not insisted that the contestants were elected to the offices for which they were candidates, but it was insisted that there had been such fraud, intimidation, bribery, or violence in the conduct of the election that neither contestant nor contestee could be adjudged to have been fairly elected. The circuit court sustained this contention, adjudging that there had been no election. The contestees appeal.

The allegations of the petition here are much the same as in Scholl v. Bell, 125 Ky. 750, 102 S. W. 248, 31 Ky. Law Rep. 335. In that case as shown by the opinion, no election whatever was held in three precincts; in one precinct the election proceeded regularly until about the time for the polls to close, when the voting place was raided by a band of armed men, the ballot box was carried off, and was never. seen thereafter. In nine precincts no election was had at the place at which the election should be held. In eight of the precincts there was no pretense whatever made to comply with the requirements of the law, as to adjourning from one voting place to another, and in the ninth a notice was prepared, but was never posted. In these removed precincts the registered voters were voted in alphabetical order from A to Z; the regular Republican officers of election being denied the right to anticipate, and the returns being so grossly false as to show the bungling manner adopted by the officers to defeat the will of the people. In another precinct the election pro-

ceeded regularly until the polls closed, when an in-
spector seized the ballots and threw them in the fire.
In still another, while the ballots were being count-
ed, a band of men rushed into the room, knocking
the Republican sheriff down, overturning the stove,
and scattering the ballots from the table to the floor.
Before order was restored, another crowd gathered
up the ballots and ballot box and carried them away.
In another precinct, before the count was finished,
the officers were driven from the room, and a clumsy
forgery was substituted for their return. In still
another precinct the Republican sheriff of election
was arrested, the Republican challenger was denied
access to the polls, the Republican judge was as-
saulted and dragged from the room, and fraudulent
returns made. There were in all 24 precincts in
which, from the causes mentioned, there were no
valid returns. Nothing of that sort occurred in this
case. At every precinct there were two Democratic
officers and two Republican officers. They acted
harmoniously; there being no difficulty in any pre-
cinct between the officers of election, and none of
them being interrupted in the discharge of their
duties. The challengers and inspectors of the
respective parties acted without molestation,
and there was no difficulty between them. After the
polls were closed the ballots were all quietly counted,
and the result duly certified. There is not in the
record any intimation that the count was not regu-
larly and properly made, or that it was incorrect in
any respect. In the afternoon paper, which issued
at 5 p. m. on the day of the election, the organ of
the contestants, it was stated that the police and fire-
men were not displaying the activity they had usual-
ly shown in former elections, and that for the first

time in years in elections in the city the sheriffs of election on duty at the various polling precincts were exercising their rightful authority, that apparently the election was one of the quietest and most orderly held in Lexington for years, and that the best citizens were at the polls to see that a square deal was had. The polls closed at 4 o'clock, but the article was prepared before the close of the polls, although the paper came out afterwards. The same paper contained an authorized statement by appellee Milward, in these words: "I am greatly pleased with the outlook, and if the orderly conditions prevail all day, and we get a fair count, we will win by a safe majority." The statements of this paper as to the quietness and orderliness of the election are confirmed by the testimony of the reporter, who went around to the different polls before writing the article, and by the testimony of a number of reporters or other persons who went around from poll to poll in like manner. The evidence on this subject is practically uncontradicted. It comes from the election officers, and from the men about the polls in every walk of life. At Asylum precinct, which is one of those now complained of, appellee Milward said everything was coming as fine as could be, and things were going off nicely; that he was glad to see it that way, and he hoped they would win, and there would be no trouble; at another precinct, now also complained of, the leading Republican said after the close of the polls he was very much pleased at the way things went on at the election; at another, that things were as fine as silk; and one of the witnesses summing up the matter says that the election officers ran the election as high-toned gentlemen manage things. The officers of election appear to have been men of

character, and to have deserved this encomium. They all appear to have tried to do their duty faithfully and impartially. There is complaint by the friends of contestants as to some of the clerks, and by the friends of contestees as to some of the sheriffs, but the harmony which prevailed among the officers and the facts established by the proof show they were trying to do the best they could under the circumstances in which they were placed.

Section 1596A, subsec. 12 Ky. St., among other things provides: "In case it shall appear from an inspection of the whole record that there has been such fraud, intimidation, bribery or violence in the conduct of the election that neither contestant nor contestee can be adjudged to have been fairly elected, the circuit court, subject to revision by appeal, or the court of appeals finally may adjudge that there has been no election. In such event the office shall be deemed vacant, with the same legal effect as if the person elected had refused to qualify."

The things complained of are these: 1. In June, before the election, the judge of the Fayette county court made an order redistricting the city of Lexington, and dividing it into 23 precincts. As shown by the registration which was subsequently taken, in 16 of these precincts there were more than 350 registered voters, and in 4 of them there were more than 500. It is earnestly maintained that this action of the county judge, who was a Democrat, was a part of a conspiracy to prevent a fair and free election, and that it had this effect. The facts in regard to the reapportionment are these: The boundary of the city of Lexington had been extended by the annexation of territory lying around the city. The old boundary was a circle, having a diameter of about

two miles; the territory annexed lay all around the city. The old boundary of the city had for years been divided into 20 precincts. At the last Presidential election there were polled in the city of Lexington 5,415 votes.

Dividing this by 20 they made each precinct to contain on an average about 270 votes. The new territory was estimated to contain 800 votes, and so the county judge concluded that three additional precincts were all that were necessary. He so divided the city into 23 districts, and, after he had made his tentative division, submitted it to a number of people, before it became final. The statute regulating the size of precincts is as follows: "Each precinct shall contain as nearly as practicable, three hundred voters, based on the number of votes cast at the last election for Presidential electors; but no precinct shall contain more than three hundred and fifty voters. If at any election hereafter held more than three hundred and fifty votes shall be cast at any voting place, it shall be the duty of the sheriff of the election in such precinct to report the same to the county court, which shall at its next regular term, divide such precinct as equally as possible, so that the new precincts formed thereof shall each contain three hundred voters, as nearly as practicable."

It will be observed that the size of the precinct under the statute is made to depend, not on the nur ·ber of voters ·in fact in the district, but on the votes cast at the last election for Presidential· electors. The fact there were only 20 precincts in the old boundary, and that these had on an average only about 270 votes each, based on the last Presidential election, are undisputed. It is also undisputed that

the additional territory contained only about 800
voters. At least no testimony is offered to contradict
the county judge on the subject. Is is also shown that
no sheriff of election had ever filed with the county
judge a report showing that more than 350 votes had
been cast in his precinct. The county judge is not
authorized to take a poll, and he is required by the
statute to establish the districts according to the
votes cast at the last Presidential election. This he
did, and if there was any fault in the matter, it is
in the statute, and not in the action of the county
court. When the Legislature provided that the dis-
tricts should be established, based on the vote on
the last Presidential election, it very well knew that
all the vote is not cast at any election, and
that at municipal elections frequently a much
larger vote is polled than at a Presidential
election. It also knew that in cities of the second
class, three years would elapse between the Presi-
dential election and a regular municipal election. So
allowing for the growth of the city, and taking into
consideration the fact that all the vote is not polled,
especially at Presidential elections, the Legislature
must have contemplated that the districts it pro-
vided for might in fact contain much more than 350
voters, and to provide a remedy for this it required
the sheriff to make the report as set out in the statute
above quoted. There is in the record not a scintilla
of evidence that the county judge acted in bad faith
or from any impure motive; and the facts show that
he followed the statute. Only two of the districts
which he established have less than 300 voters in
them, and these two districts were left unchanged
in the reapportionment. The trouble here came from
the fact, either that the city had grown more than

was thought, or that the heated municipal election drew out a much larger vote than the city appeared to have.

In this connection it is also complained that in the precincts where the heavy vote was registered the sheriff only put in three booths, and not one booth for each 100 voters as shown by the registration. Section 1467, Ky. St., regulating the number of booths, is in these words: "The number of such booths shall not be less than one to every one hundred voters, and one for every fraction of one hundred voters exceeding fifty who voted at the last preceding election in such precinct." It will be observed that this section also fixes the number of booths, not according to the number of voters in the district, but according to the number "who voted at the last preceding election in such precinct." As the districts had just been established, the sheriff could only be guided by the presumption that the county judge had done his duty, as provided in section 1443, and, acting upon the presumption, he was only required to put in three booths in each precinct. It might have been wiser in the statute to require the sheriff to be governed by the registered vote in cities where registration is had, but the statute does not so provide. The sheriff literally followed the statute. When it was known what had been done no one applied to him to put in more booths. Contestees knew then, as well as they know now, the number of registered voters in each precinct, and if they desired more booths, they should have applied to the sheriff to put them in. They cannot now be heard to complain of the sheriff for not thinking of what they did not think of themselves.

It is insisted for the contestees that, though all
this is true, still under the Constitution elections
must be free and equal, and that this election was not
free and equal, by reason of the fact that there were
so many voters in the different precincts that many
were unable to register, and many of those who reg-
istered were unable to vote.   Of the 23 precincts
everybody registered at all but 4 precincts, Consti-
tution Street, Power House, Race Track, and Yell-
mantown.   The evidence as to the number who failed
to register at each of these precincts is very conflict-
ing, and this is not unreasonable because about the
time .the polls close, there are usually quite a num-
ber of persons standing around, and it is not easy
to tell those who have registered or voted from those
who have not.   At Constitution Street there was a
difficulty between two bystanders not long before the
registration closed, and this scattered the crowd and
interrupted proceedings for a while.   According to
one witness for the contestants, there were 60 in line
who did not register; another witness for contestants
puts the number at 25 or 30.   On the other hand the
witnesses for the contestees testify that there were
only a few left who did not register; six or seven
being in the room and a few on the outside.   At
Power House one witness for the contestants says
there were 50 men waiting; another 75; another 87;
another 30 or 40.   One witness for the contestees
says there were none left at registration; another
says there were a few left, and still another that
there were some in line.   At Race Track, the proof
is indefinite.   At Yellmantown, the proof for the con-
testants is that there were 15 or 20 left at registra-
tion, and that for the contestees is that there were
but  few  there  who  had  not  registered.   At

Constitution Street it is conceded that everybody voted before the time for closing the polls. The evidence as to Irishtown shows the same there. At Merino Street 15 or 20 men were in line when the polls closed; at Power House about 50, according to the evidence for contestants, but according to the evidence for the contestees, a large number of these had voted. At Race Track there were about the same conditions. At Yellmantown there were, according to the evidence of the contestants, 20 or 30 who had not voted; according to the evidence of the contestees, from 10 to 15. At Race Track the sheriff of election, being unable to get the voters to move back 50 feet from the polls, closed the poll for more than an hour, and refused to allow any votes to be taken. If this had not been done, all would have voted there. At Yellmantown, when the voters became apprehensive that all would not vote, a rush was made on the polls, which was followed by some blows. If this had not occurred, and all had gone on quietly, few, if any, would have been left there. In some of the other precincts this condition is developed by the evidence; both parties massed their voters upon the polls in the forenoon, each trying to get its vote in first. The result was that there was a pack in the earlier part of the day, and during a part of the afternoon the voting was more slack. But for the delay due to the packing of the voters around the polls, and the time that was afterwards lost, it is questionable if there would have been many persons who could not have voted at this election if they had come to the polls a reasonable time before they closed, taken their places in line, and held it until their turn came. It is not uncommon at all elections for some persons to be left

at the close of the polls; for many persons put off
voting until the latter part of the day to save time.
There was no such denial of the right to vote in this
election, when we compare the number of those who
could not register or vote with those who did register
and vote, as to justify us in holding that the elec-
tion was not free and equal.   There were 6,932 votes
cast at the election.   There were according to the
evidence 1,844 persons who registered and did not
vote.   Of these 1,268 were registered as Democrats,
516 as Republicans, 56 as Independents, 3 Prohibi-
tionists, and 1 Socialist.   It will thus be seen that of
the persons who registered and did not vote there
were more than twice as many Democrats as Repub-
licans; and, while it is evident from the proof that
some persons who registered as Democrats voted the
Republican ticket, there is nothing in the evidence
to warrant the conclusion that, if all the registered
voters had voted, the percentage of those voting as
they registered would have been different from what
it was in the case of those who in fact voted, or that
the majority for the contestees would be less than
it was.   On the contrary, it appears from the evi-
dence that the sheriffs allowed their friends on the
outside to indicate who should go in to vote when
there was a vacancy in the booth, and in this way
in a number of precincts, the contestees complain
that they were not fairly treated.   The sheriff tried
to do his duty and to be impartial; the fault, if any,
was in those whom he allowed to attend to the mat-
ter.   It is said that the number who registered and
did not vote in this election is so large as to show
that something was wrong, but in every election there
are many who register and do not vote, for one rea-
son or another.   In this case the contestees or their

friends had printed circulars offering a reward of $100 for the arrest and conviction of any one voting illegally, and these circulars were, scattered about the voting places. There were two men going in and out among the crowd saying this by word of mouth, and it may be that some who were timid were thus prevented from voting. But, however this may be, on the showing before us we cannot say that the contestants suffered by any of these things.

2. The election commissioners appointed in each precinct a Democratic judge, a Republican judge, a Democratic clerk, and a Republican sheriff. It is insisted that the election was not free and equal because the Democrats were given the clerk in every precinct, and the Republicans the sheriff in every precinct. The statute requires the offices to be equally divided, but it does not require them to be alternated. The clerk has certain important functions in an election, but the sheriff is also an important officer. His duties are defined in section 1484, Ky. St.: "In addition to the other duties provided herein, it shall also be the duty of the sheriff of each precinct to preserve order at the polls and enforce the provisions of the election law, under the direction of the judges; and when the judges disagree, the sheriff shall act as umpire between them." On all questions where the judges disagree the sheriff is the umpire between them. It is said that, though the sheriff has the deciding vote at the election, the clerk is given this at registration, and the person when once registered is entitled to vote.. But this argument overlooks the fact that names illegally registered may be stricken out by a proceeding instituted by any voter in the county court. Ky. St. section 1501. It is shown here also that at the registration

the officers were harmonious; that rules were agreed
on in advance; that these rules were applied im-
partially to all; and that few persons were denied
registration, unless admittedly disqualified.    That
some time was taken up with persons not legally
entitled to registration is a matter occurring in all
elections.    The sheriff is not the cock of the walk,
as one witness expresses it in the record.   Nor does
he, except under the direction of the judges, run the
election.   It is his duty to preserve order at the polls
and enforce the provision of the election law under
the direction of the judges.   A policeman has no
more to do with the running of the election than a
private citizen.   He should not take any  part in
maintaining order within 50 feet of the polls, unless
it is then necessary to preserve the peace, or he is
requested to do so by the sheriff.   Whatever he does
within 50 feet of the polls he should do in assisting
the sheriff, and he should under no circumstances in-
terfere with him in the discharge of his duties.   Sec-
tion 1585A, Ky. St., subsec. 15 provides:  ''Any per-
son or persons,   *   *   *   who shall unlawfully in-
terfere with the officers of election in the discharge
of their duties as such, shall be deemed guilty of a
felony and, upon conviction, be confined in the peni-
tentiary for a period of years, of not less than one
nor more than five years, for each offense.   The fact
that the person or persons so offending may be an
officer or officers of the federal government, or of
the state or any district, county, town or city thereof,
or of election, shall not relieve them of the responsi-
bility or penalty for the violation of this section.''
Under this statute no peace officer may interfere
with an election officer in the discharge of his duties.
He may maintain order.   He may, when requested by

the sheriff of election, assist him in maintaining order; but, unless so requested, or it is necessary to preserve the peace, he should remain 50 feet from the polls. The election officers have control of the polls and of the space within 50 feet of them. If a policeman necessarily comes in this space to preserve order, he should withdraw when the present necessity is removed. At registration his authority is no greater than at the election. There is much evidence in the case that the police unduly interfered with the election, but without discussing the facts in detail, 'it is sufficient to say that, while the proof is conflicting, the weight of the evidence is with the peace officers as to some of these matters, and as to the others they had no effect on the election.

3. It is insisted that there was fraud in the election, in this: That persons registered who had no right to register, and that persons voted who had no right to vote. Contestants charge by their petition that there were 562 illegal registrations, but proof was taken as to less than 200 of these, and as to some of them the proof is not sufficient to show that they were illegal. The contestants also alleged that there were 573 illegal votes cast, but there was no proof as to 345 of these, and perhaps not more than one-half of the remainder were illegal. In every election in a city like this there will be some illegal registrations and some illegal voting, but the percentage of illegality here as compared with the total vote is too small to affect the result. It is not shown for whom the illegal votes were cast, and without this it cannot be known that contestants were prejudiced thereby. An illegal voter may be required to say how he voted, and it may be that contestees' majority would be that much larger if none of these

men had voted.  Combs v. Combs, 97 S. W. 1127, 30
Ky. Law Rep. 161; Scholl v. Bell, 125 Ky. 786, 102
S. W. 248, 31 Ky. Law Rep. 335.  Much of the record
is taken up with proof as to intimidation.  But upon
the whole case we see little ground for disturbing
the election on this ground.  It was the old battle
occurring in all our municipalities every four years
of the outs against the ins.  Both sides were de-
termined to win, and on both sides there was some
zeal.  But on both sides it was insisted by those in
charge that only fair means should be used, and so
far as they could this was done.  It is gravely ar-
gued here on the testimony of one witness, a by-
stander, that the mayor of the city on the night of
registration ordered a policeman to raise a rough-
house at 8 o'clock, and that promptly at 8 o'clock the
rough-house was raised, and thus a large number of
voters was prevented from registering.  The mayor
has since been a prominent member of the state Sen-
ate, and that he should do such a thing is very im-
probable.    The   proof   shows   that   the   police-
man had been boisterous and was drinking, that
the mayor rebuked him for his   misconduct   and
roughness, and that the witness simply   misunder-
stood what the mayor said.   The proof also clearly
shows that the rough-house was started by a diffi-
culty between two bystanders over a private matter
of their own, and that the policeman had nothing to
do with it.  In the heat of this election a person here
and there became unduly excited, or, as frequently
happens at elections, here or there was a man who
had imbibed too freely, and created some momentary
disturbance, but these things were of short duration
and in no wise affected the result of the election.

4. It is insisted that there was bribery. The proof shows that the campaign committee for the contestants spent about $3,300, and that the campaign committee for the contestees spend about $3,100. There is nothing in these figures to show that an improper amount of money was used in the election. In this respect the case is altogether different from Scholl v. Bell. In that case there was an enormous corruption fund. There is some evidence in the record as to the purchase by different persons of registration certificates. Section 1488, Ky. St. provides: "The officers of registration shall issue a certificate of registration to each voter registering at the time he registers showing that he has registered, and the date of his registering, and no person who is required to register, under the provisions of this act, shall have the right to vote at any election held in this commonwealth, until he shall have presented to the election officers his certificate of registration." Under the statute the voter cannot vote unless he presents to the election officers his certificate of registration. To buy the certificate in order to prevent him from voting is to buy him not to vote. To buy a man not to vote is no less bribery under section 1596A, subsec. 12, than to buy him to vote in a certain way. The voter should be left entirely free in his right of suffrage, and any influence of this right by the payment of money or other thing of value is under this statute bribery of the voter. But to set aside an election on the ground of bribery, it must appear that the result was affected thereby. The proof here as to the purchase of the certificates is too indefinite. While it shows in some instances that voters sold their certificates, the number of such sales is too small for serious effect on the result. The pre-

sumption is that the election officers did their duty, that the election was properly held, and that the official count gives properly the result. The burden of proof is on the contestant to show such fraud, intimidation, bribery, or violence in the conduct of the election that neither the contestant nor contestee can be adjudged to have been fairly elected. These things are not presumed, but it must be affirmatively shown, not only that they existed, but that they affected the result to such an extent that it cannot be reasonably determined who was elected. Napier v. Cornett, 68 S. W. 1076, 24 Ky. Law Rep. 579; Motley v. Wilson, 82 S. W. 1023; Combs v. Combs, 97 S. W. 1127, 30 Ky. Law Rep. 161; Scholl v. Bell, 125 Ky. 776, 777, 102 S. W. 248, 31 Ky. Law Rep. 335. Elections are not lightly set aside. They are the means provided by law for the expression of the will of the people. To set them aside unnecessarily would be to destroy that confidence in them which is essential. If often set aside, they would be less attended; for the voters would await the next chance, and the election, instead of settling things, would be only the starting point for new controversies. Elections must be free and equal; but they cannot be free and equal unless supported by public confidence. When once the notion prevails that confidence may not be placed in the stability of elections, their power and usefulness is destroyed. To set aside an election, fairly held, on such proof as we have here would be to lay down a rule under which confidence in elections would be impaired, and litigation over them would be invited. There is not a precinct in which contestants' case is as strong as in the twenty-eighth precinct of the tenth ward in Scholl v. Bell, 125 Ky. 785, 102 S. W. 248, 31 Ky.

Skain v. Milward.

Law Rep. 335, and it was there held that the returns from that precinct must stand. A city is but the aggregation of the precincts composing it, and, if the result in no precinct can be disturbed, the result in the city as shown by the returns cannot be set aside.

The conclusion we have reached makes it unnecessary for us to pass on the exceptions to the depositions; but, in cases like this, where the depositions are taken in shorthand, they should be transcribed and signed by the witness before the contestee may begin taking his proof, so that he may not be at disadvantage in preparing his case.

The judgment in each case is reversed, and the cause is remanded to the circuit court, with directions to dismiss the petition.  Whole court sitting.