WILKINSON ET AL. *v.* McGILL ET AL.

[No. 87, October Term, 1948.]

388

*Decided February 16, 1949.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*David Kauffman,* with whom was *Harry Kauffman* on the brief, for the appellants.

*William A. Gunter,* with whom were *D. Lindley Sloan* and *F. Brooke Whiting* on the brief, for the appellees.

MARBURY, C. J., delivered the opinion of the Court.

The General Assembly of Maryland, by Chapter 13 of the Acts of the Special Session of 1947, made provision for the creation of a sanitary district in Allegany County, to be under the supervision of a body to be known as La Vale Sanitary Commission. The Act is long, and there is no occasion in this opinion to discuss its provisions, other than to say that authority is given to the Commission to provide water supply, sewerage and drainage systems within election district No. 29 of the County. It provides for the issuance of bonds and the levying of taxes therefor. The Commission is to consist of three persons residing in election district No. 29, to be appointed by the Board of County Commissioners of Allegany County. Each of these commissioners is to receive a salary. It is also enacted that the provisions of the Act shall not take effect, until it has first been submitted to the qualified voters of the contemplated district, and

approved by a majority of those voting. The election is to take place within 90 days after the passage of the bill, which was approved November 10, 1947. The Board of Election Supervisors of the county is authorized to determine the time, place or places, and the manner for the submission of the question, and for ascertaining the results. In holding such election or elections, the General Election Law of the State, Code Supp. 1947, art. 33, is to apply whenever applicable.

This Act was declared to be an emergency act and was passed by three fifths of all the members elected to each of the two houses and was to take effect from the date of its passage. As Article XVI of the Constitution does not apply to such public local laws, *Dinneen v. Rider,* 152 Md. 343, 136 A. 754, the effective date of the Act, therefore, subject to the referendum provided for in it, was November 10, 1947. The Board of Supervisors of Elections of Allegany County held a special election on January 22, 1948, in which, according to the testimony, 692 registered voters participated. The majority for the bill was 16; 354 voting for it, and 338 against it.

On February 10, 1948, the appellees, consisting of 38 voters, residents and taxpayers of Election District No. 29, suing for themselves as well as for all others who might come in and contribute, filed their bill of complaint in the Circuit Court for Allegany County, alleging, among other things, that the Act was not properly submitted to the qualified voters, because a registration was held by the Board of Election Supervisors on December 20, 1947 at the Court House in Cumberland, without any proper notice, that such registration was conducted by the clerk and not by the Board, that the books were open for only five hours, and as a result, 28 (the evidence shows 26) people registered illegally and that the election was illegally held in a bowling alley, in violation of Section 9 of Chapter 934 of the Acts of 1945. The court was asked to declare that the Act had not been lawfully adopted, that the election was null and void, that the Act was not in effect, and to restrain the County Commissioners from

appointing the Sanitary Commission, and from exercising any authority or power under the Act. The Tax Collector was also made a party defendant. Thirty-nine other residents and taxpayers of the district asked leave to intervene as defendants and thereafter filed an answer. The County Commissioners and Tax Collector also filed an answer, and a cross bill in which they asked for a declaratory judgment to the effect that Chapter 13 is constitutionally valid, that the election held was a valid election, or if the latter is not the case, that Chapter 13 should be resubmitted at another and valid election. To this cross bill the defendants filed a demurrer. Testimony was taken and the Chancellor came to the conclusion that the Act was valid and constitutional, but that the election of January 22, 1948, was not valid and therefore, the statute is not in force. The court also sustained the demurrer to the cross bill, because the Board of Election Supervisors of Allegany County, which was authorized to call the election under the Act, was not made a party. The court enjoined the official defendants from exercising any authority and power under the provisions of the Act. From this decree all the defendants, both official and personal, appealed.

The additional contention was made in the bill of complaint and in the lower court that Chapter 13 of the Acts of 1947, Special Session, was unconstitutional and void because it was claimed that its title was imperfect, and did not comply with Section 29 of Article 3 of the Constitution. No appeal was taken by the appellees, because they were successful below on other points, but we have examined this question and have come to the conclusion that the chancellor was correct in his decision that the Act was valid.

The only questions before us on this appeal are those respecting the election, and the supplemental question, to be decided if we hold the election void, as did the lower court, whether a new election can be held. The reasons for the contention that the election is void are two-fold: First, that part of it was held in a bowling alley under

the circumstances hereafter related, and in contravention of the election laws of the State; and second, that there was an illegal registration of 26 people of whom 23 voted; and that as the majority in favor of the Act was only 16, these illegal votes, if cast in favor of the Act, carried the election, whereas, if they had not voted, it is probable that the election would have been decided the other way. These two contentions will be considered in their order.

The testimony showed that the polling place in the 29th Election District of Allegany County had been for a number of years, at the residence of a Mrs. Lancaster. Notices of the election were published in the Cumberland News and in the Cumberland Evening Times by the election supervisors on December 17 and 22 and January 7, 14 and 20. The first notice stated that the polling place of the second precinct in District No. 29 would be the residence of Mrs. Lancaster, but the subsequent notices said that this polling place would be Jack Poisal's Bowling Alley in Allegany Grove. After the first notice was posted, and about three weeks before the election, Mrs. Lancaster called the Board, and said that the election could not be held in her house, as had been heretofore the custom. As a result, the clerk and some of the election officials attempted to find a new polling place. The only available place they could find was the bowling alley, in which there was no bowling from midnight until after seven o'clock in the evening. The bowling alley was used for the election, which was held from seven in the morning until seven in the evening on January 22. On that morning, Mrs. Lancaster put a notice on her home which remained there all day, that voting was to be at Poisal's Bowling Alley. It is not shown that any voter was deceived by the change thus made, and it is apparent that if anyone went to Mrs. Lancaster's house to vote, the notice posted there would indicate where the voting was being held. The appellees contend, however, that the use made of the bowling alley as a polling place violated two provisions of the General Election Laws of the State.

One of these is Section 9 of Article 33, Code (1947 Supp.), which provides that "in no case shall a * * * election be held in any building or part of any building used or occupied as a * * * bowling alley." The other is Section 10 of Article 33, Code (1947 Supp.), which provides that the Board of Supervisors shall give ten days notice of the time and place of all elections in each precinct by advertisement and by hand bills. It is obvious such violations did occur, and the question before us is whether they render the election void.

There is a clearly recognized difference between the interpretation given to provisions of the election laws before election and the construction of these same provisions after election. The election officials are required to do what the law tells them to do and this can be enforced by appropriate court action, *Munsell v. Hennegan,* 182 Md. 15, 27, 31 A. 2d 640, 146 A. L. R. 660, but when an election has been held and it is not shown that the failure of the officials to observe the requirements of the law has interfered with the fair expression of the will of the voters, courts have generally held that the result of the election will not be disturbed. The reason for this is that unimportant mistakes made by election officials should not be allowed to thwart the will of the people freely expressed at the ballot box; or as better expressed by this Court, speaking through Judge Alvey, in the case of *State v. County Commissioners of Baltimore County,* 29 Md. 516, at page 522, "* * *. That it should be in the power and election of subordinate ministerial or executive officers, by refusing to obey the law, to defeat and nullify it, is a proposition too startling to be favorably entertained in a court of justice."

There have been a number of cases in this Court in which irregularities have been asserted to render elections void and the Court has uniformly adopted the construction above set out where the irregularities did not affect the result. In the case of *Smith v. Hackett,* 129 Md. 73, 98 A. 140, 142, the polling place for a precinct in Dorchester County was in an adjacent precinct, al-

though just across the street. The Court said no discretion or authority was vested in the Board of Supervisors to go beyond the outlines of a precinct to secure a polling place. Their duty was to find one within the area and this duty could have been enforced by judicial processes upon a showing that it was about to be disregarded. However, the issue was not raised until after the election, when the voters of the precinct had resorted to the only voting place provided for them, and the question was whether their votes should be rejected because of the failure of duty on the part of the election officials. The Court decided that this would not be done, saying:

"In the absence of any proven injury to any interest involved from the mere fact that the polling room for the precinct was at the location mentioned, we can find in that circumstance no just cause for invalidating the entire vote of the precinct and depriving the candidates for whom it was cast of its legitimate effect. This would be far too serious a result to recognize as a proper and necessary consequence of the particular breach of administrative duty under consideration."

In the case of *Seyboldt v. M. & C. C. Mt. Ranier,* 130 Md. 69, 99 A. 960, 962, one of the objections to the validity of an act which had to be approved at an election was that insufficient notice of the election had been given. The Court said there was no non-compliance with any "mandatory statutory requirement."

It is not necessary to go beyond our own decisions, but it may be noticed that in a number of other jurisdictions similar conclusions have been reached. See *State v. Salt Lake City,* 35 Utah 25, 99 P. 255, 18 Ann. Cas. 1130 (defective notice); *City of El Dorado v. Jacobs,* 174 Ark. 98, 294 S. W. 411 (changed polling place); *City of Albuquerque v. Water Supply Co.,* 24 N. Mex. 368, 174 P. 217, 5 A. L. R. 519 (notice); *Taylor v. Taylor,* 10 Minn. 107, Gil. 81 (notice); *Sykes v. Pandora, etc., District,* Tex. Civ. App., 14 S. W. 2d 124 (notice); *Loop v. McCracken,* 151 Wash. 19, 274 P. 793 (general irregularities); *Gilligan v. Special Road, etc., District,* 74 Fla. 320, 77 So. 84

(general irregularities) ; *People v. Graham,* 267 Ill. 426, 108 N. E. 699, Ann. Cas. 1916C, 391 (location of polling place), citing cases from New Jersey, New York, Nebraska, New Hampshire, Texas, Kansas and Mississippi; *State v. Hackmann,* 304 Mo. 478, 264 S. W. 389; *Lamb v. Palmer,* 79 Okl. 68, 191 P. 184; *Womack v. Nettles,* 155 La. 359, 99 So. 290—all as to location of polling places.

The general subject of the effect of irregularities in an election is discussed in *McQuillin's Municipal Corporations,* 2nd Ed. Revised, Vol. 5, Par. 2361, where it is said "* * * mere irregularities which do not prevent a full and free expression of opinion of the will of the electors, and change the result, will not invalidate the election. This rule has been applied to irregularities in notices; * * * in the time and place of the election * * *. The reason is that the courts are anxious rather to sustain than to defeat the popular will."

These principles do not apply to a situation where there is a preemptory requirement designed to safeguard the integrity of elections, the neglect of which presents an apparent opportunity for fraud. An illustration of this is the recent case of *Hammond v. Love,* 187 Md. 138, 49 A. 2d 75, in which we held that ballots, which were not properly initialed should not be counted.

Our conclusion on this phase of the case is that as to the failure to give the required notice, as to the change in the place of holding the election after the first notice was given, and as to the holding of the election in a bowling alley, none of them are shown to have affected the ultimate result, and, as mere irregularities, they should not be allowed to set aside what the voters have decided.

The second question presented presents more difficulty. A registration was held in the Court House in Cumberland for the purpose of permitting the qualified voters who had recently become residents of Election District No. 29 to change their precinct registration so that they might vote at the special election. This was on December 20, 1947. There was no advertisement of it in the newspapers as required by Section 10 of Article 33 of

the Code. The registration was not conducted by the members of the Board, who were not present, but by their clerk, who registered 26 persons. The only notice the public had of this so-called supplemental registration was a newspaper article in the Cumberland News on December 18 which stated that Charles R. Wherritt, Chairman of the Water Committee of the La Vale Civic Association, which was sponsoring the measure to be voted on, said that the Allegany County Board of Election Supervisors had agreed to open the office in the court house basement on Saturday, December 20 from one until six P. M. There was also a similar article in the Cumberland Evening Times on December 18, also quoting Mr. Wherritt. In both articles, Mr. Wherritt is quoted as saying that "The arrangements were made after a number of La Vale residents had made inquiries regarding voting restrictions." It is admitted by all parties that there was no authority in the Board or in the clerk to hold such a registration, that the 26 names were illegally placed upon the registration book, and that the 23 of these 26, who cast their ballots at the election voted illegally. It is apparent that since the Act received a majority of only 16, the voting by these 23 people might very materially have affected the result. If 20 of them voted for the Act and 3 against it and these votes are deducted from the recorded totals, the correct result would be 335 against the Act and 334 for it, or a reversal of the result. It is contended by the appellees that the fact that a proponent of the Act had apparently made the arrangements for the registration or, at any rate, was the person through whom the only notice was given to the public, indicates that the registration was arranged for the purpose of helping the friends of the Act, and that there exists a strong presumption of fact that those who registered were its proponents. On the other hand, it is pointed out that anyone reading the newspaper articles and desiring to change his or her precinct registration, could come to the appointed place at the appointed time

and have such change made, without regard to his or her position on the adoption of the Act.

It is stated in *Dillon on Municipal Corporations,* 5th Ed., Vol. 1, Sec. 376, "Receiving *irregular* or *improper* votes will not alone vitiate an election. It must be shown affirmatively, in order to overturn the declared result, that the wrongful action *changed* it." In *Paine on Elections,* Par. 513, page 433, it is stated: "Where illegal votes have been cast, the true rule is to purge the poll, by first proving for whom they were cast, and thus ascertain the real vote; but if this cannot be done, then to exclude the poll altogether. This is safer than the rule which arbitrarily apportions the fraud among the parties." In *McCrary on Elections,* 4th Ed., Chapter XIV, Par. 497, p. 366, it is stated:

"It would seem, therefore, that in a case where the number of bad votes proven is sufficient to affect the result, and in the absence of any evidence to enable the court to determine for whom they were cast, the court must decide upon one of the three following alternatives, viz.:

"1. Declare the election void.

"2. Divide the illegal votes between the candidates in proportion to the whole vote of each.

"3. Deduct the illegal vote from the candidate having the highest vote."

The appellants insist that the burden is upon those attacking an election to show that the successful ticket at the polls received a sufficient number of improper votes to change the election, that this burden is not sustained by merely showing such a possibility, that the appellees in the case before us did not sustain this burden, and did not attempt to show how and in whose favor the illegal votes were cast. They contend, with Dillon, that it is an established principle that the mere casting of illegal votes does not avoid an election, unless it is shown that such votes affected the result. In support of these contentions, there are numerous cases from other jurisdictions such as *Ex parte Murphy,* 1827, 7 Cow., N. Y., 153; *Inhabitants v. Stearns,* 1838, 21 Pick., Mass., 148;

*People v. Cicott,* 1868, 16 Mich., 283, 7 Am. Dec. 141; *Judkins v. Hill,* 1870, 50 N. H. 140; *Brown v. Atlanta,* 1921, 152 Ga. 283, 109 S. E. 666; *Hardigree v. White,* 1938, 275 Ky. 364, 121 S. W. 2d 919; *Atkinson v. Roosevelt Co.,* 1924, 71 Mont., 165, 227 P. 811; *MacGuidwin v. S. Park Com'rs,* 1928, 333 Ill. 58, 164 N. E. 208; *Lehlback v. Haynes,* 1891, 54 N. J. L. 77, 23 A. 422; *In re Incorporation of Town of Big Cabin,* 1928, 132 Okl. 200, 270 P. 75; *Gross v. Ball,* 1935, 258 Ky. 730, 81 S. W. 2d. 409; *Morrison v. Buttran,* 1926, 154 Tenn. 679, 290 S. W. 399; *Petition of Clee,* 1938, 119 N. J. L. 310, 196 A. 476; *Goar v. Brown,* 1921, 82 Okl. 227, 200 P. 156; *Pippin v. Holland,* Tex. Civ. App. 1940, 146 S. W. 2d 266; *Tazwell v. Davis,* 1913, 64 Or. 325, 130 P. 400.

There have, however, been decisions to the contrary in cases in which it has been impossible to ascertain how the illegal voters voted, or where, under the circumstances, the interests of the public would be best served by striking down the election and having a new one. Thus in South Carolina, it was held in an early case in 1795, where the illegal votes were taken from the highest candidate, that voters should not be sworn and if, after the deduction, there was doubt, a new election should be ordered. *Johnston v. Corporation of Charleston,* 1 Bay 441. In California, nine absentee ballots were improperly counted. The court threw the election out, saying that: "Assuming * * * that the nine absent voters personally appeared in court and testified they voted for the plaintiff, the very necessity of such evidence destroys the secrecy of ballot." *Scott v. Kenyon,* Cal. App., 93 P. 2d 160, 162, affirmed 16 Cal. 2d 197, 105 P. 2d 291. The Nebraska court, however, held that since no effort was made to bring any of the illegal voters into court to testify for whom they voted, the election should be upheld, stating "Litigants and courts are not helpless when such information is essential to the administration of justice." *Mehrens v. Election Canvassing Board,* 134 Neb. 607, 278 N. W. 252, 254. In Mississippi, it was held that while a qualified voter could not be interrogated about

his ballot, "this exemption does not belong to an illegal voter." *Trahan v. Simmons*, 191 Miss. 353, 2 So. 2d 575. In another Mississippi case, the court said that it was not troubled by the inability of the complainant to compel an illegal voter to disclose for whom he voted, because, if the appellant in that case was unable to ascertain this "that is just his hard luck for which the appellee is in no way to blame." *Simmons v. Crisler*, 197 Miss. 547, 20 So. 2d 85, 88. In a Texas case, *Roberts v. Hall*, Tex. Civ. App., 167 S. W. 2d 621, the court said that the burden was on the contestant to show either that a different result should have been reached by counting or not counting certain specified votes, or that the irregularities were such as to render it impossible to determine the true will of the majority of the voters. In *Skain v. Milward*, 138 Ky. 200, 127 S. W. 773, it is stated that an illegal voter may be required to say how he voted, and without this it cannot be shown that contestants were prejudiced. In the Michigan case of *People ex rel. Saunders v. Hanna*, 98 Mich. 515, 57 N. W. 738, 82 inmates of the Soldiers Home voted illegally at the election. There was a majority of three votes and the court said: "* * * as it is impossible to ascertain which candidate received the greater number of votes, the vote of the precinct must be excluded," referring to *Attorney General v. McQuade*, 94 Mich. 439, 53 N. W. 944.

In some cases it has been held that the illegal votes, in the absence of proof for whom they were cast, should be deducted from the contestant, unless he proves he could not show for whom such votes were cast, in which case they should be deducted ratably. The leading authority for this rule is *Briggs v. Ghrist*, 28 S. D. 562, 134 N. W. 321. Others are *Nepier v. Cornett*, Ky., 68 S. W. 1076, and *Cameron v. Babcock*, 63 S. D. 554, 262 N. W. 80, 101 A. L. R. 650. This last is a three to two decision, and there is a dissenting opinion which cites another Kentucky case, *Childress v. Pinson*, Ky., 100 S. W. 278, where the *Napier-Cornett* case rule was reversed. In a well reasoned Idaho case, *Jaycox v. Varnum*, 39 Idaho 78,

226 P. 285, a number of illegal voters were put upon the stand and, after deducting those of these who voted for the defendant, and disregarding others of whom no proof was offered, the complainant had 792 votes for clerk of the court and the respondent had 795. The court quoted the discussion from *Paine on Elections,* pages 433 and 434 and cited cases for apportionment from Michigan, Illinois, Montana, Tennessee and California. It agreed with Paine that apportionment was arbitrary and decided nothing. Cases where the entire vote of the precinct was thrown out were cited from Colorado, Michigan, Kentucky and South Carolina but these were said to involve situations where all of the ballots were tainted. The only case where the entire vote was thrown out on a mere irregularity was said to be *People v. Hanna,* 98 Mich. 515, 57 N. W. 738. The Idaho court said that no sound argument could be made to take all the illegal votes from one candidate and that left two alternatives; one was to set the election aside and the other was to decide for respondent on the ground the contestant had not made out his case. The latter conclusion was adopted in that case.

*McCrary on Elections,* Paragraph 497, previously quoted in part, states that where no great public inconvenience would result from declaring the election void, that course should be adopted, but where it is essential that a party to the contest be confirmed in office to prevent public inconvenience, the apportionment method should be adopted, but the illegal votes should not be deducted from the candidate having the highest vote. He, however, distinguishes between cases where proof is within the reach of the party whose duty it is to produce it. If such party neglects to show for whom the illegal votes were case, he will be held answerable for his own neglect. In paragraph 492, he states that a person who votes without being qualified is an intruder, and can be compelled to make the disclosure how he voted, but an illegal voter may decline to testify on the ground that his answer might incriminate him. In such case,

the contents of the ballot may be shown by other testimony or by circumstantial evidence, such as that the voter was an active member of a particular political party, or obtained his ballot from a person who was actively supporting a party ticket. In paragraph 495, he discussed the deduction of the illegal votes from the total amount, and shows that in the application of this rule, they would be deducted proportionately from both candidates and, while he says that this is the safest rule that can be adopted, it is manifest that it may sometimes work a great hardship. He concludes, in paragraph 496, by saying that in any body or tribunal having power to order a new election, it will generally be regarded as safer and more conducive to the ends of justice to order such new election.

The appellees in the case before us made no effort to call as witnesses the 23 illegal voters, nor did they explain their failure to do so.

We have no direct precedent for the present situation in this state, but there is one case which has some features in common with the case before us. That is *Graf v. Hiser*, 144 Md. 418, 125 A. 151. In that case, the legislature had created a special taxing district in Prince George's County, subject to the approval of the qualified voters of the county residing within the limits of the district as defined in the Act. The referendum was to be held on a specified date and was to be conducted and the result declared by a committee of five named persons. The committee set up a notice in which they defined the qualifications of those who would be allowed to vote as "resident taxpayers" which was a different test of eligibility from that provided in the statute. The election was participated in only by those qualifying under the improper test. The record shows that 120 people voted at the election. The evidence offered was that one person voted in the election who was not a qualified voter, one registered voter was prevented from voting by the qualifications prescribed, and three qualified voters did vote, but before they were allowed to cast their ballots, were asked

if they were taxpayers. A witness testified without objection that he thought the result would have been different had the registered voters been permitted to vote without respect to their qualifications as taxpayers, and he further said, also without objection, that he thought the registered voters opposed exceeded the number in favor of the bill. This Court said that the deviation from the terms of the statute was of such consequence as to fully justify the view that the election ought to be treated as a nullity, and that the court action should be treated as a suit by taxpayers to prevent expenditures under what was alleged to be an inoperative law, and not as an election contest. The exercise of any powers, proposed to be conferred by the statute, was enjoined.

That case is distinguishable from the case before us in this respect. There the issue was the prevention of legal voters from voting, rather than the counting of illegal votes. In the *Graf-Hiser* case, the complainants could not well prove how the legal voters would have voted and the opinion testimony, above referred to, admitted without objection, could have influenced the court in its decision of the case.

The question is by no means free from difficulty, but we think the weight of authority and the better reasoning uphold the view that complainants, desiring to avoid an election because illegal votes are cast, have upon them the burden of proving for whom these votes are cast. They cannot thrust that burden upon the Court by arguing that there is a probability that such votes were cast for the side having the majority. They must prove, or at least attempt to prove, how the illegal voters voted. If direct proof cannot be obtained from the illegal voters themselves, other evidence of a circumstantial nature may be offered. In any event, there must be an effort to produce this proof. If an effort is made, which proves futile, and there is no way of producing proper evidence, it may be that the safest procedure is to throw out the election, but we have not that situation before us. As we have already said, the appellees in this case made no effort,

either to prove how the illegal voters cast their ballots, nor to offer any explanation of their failure to do so. They did not state that such evidence was impossible for them to obtain. Under these circumstances, we must conclude that they have failed to meet the burden imposed upon them, and that the election must stand. As a result, the Act is now in force, and the chancellor was in error in enjoining its operation.

In view of our conclusion it becomes unnecessary for us to pass upon the cross bill of the appellants, although we think the demurrer to it was properly sustained because the Board of Supervisors of Election was not a party to the case. There is, however, no necessity for any determination of the power of the Supervisors to order another election, since we uphold the one already held.

For the reasons stated, the decree will be reversed and the bill of complaint and the cross bill both dismissed, each side to pay its own costs.

*Decree reversed, bill and cross bill dismissed, each side to pay its own costs.*