Re: Request for opinion concerning effect of non-compliance with advertising requirements for proposed charter amendment.
Dear Mr. McDonald:
Question presented: Whether the results of the voter referendum held at the general election in Talbot County on November 4, 2008, concerning proposed amendments to the County Charter, Question "A," to amend the manner in which a Council vacancy is filled (approved), an d Q uestion "B, " to establish a County *Page 113 
Council Salary Commission (disapproved), are valid, despite non-compliance with pre-election advertisement requirements.
Facts: Maryland Constitution, Article 11-A § 5 provides, in pertinent part, ". . . The [charter] amendments shall be published by the Mayor of Baltimore or President of the County Council once a week for five successive weeks prior to the election in at least one newspaper published in said City or County."
This five-week advance publication requirement is included separately in Section 805 of the Talbot County Charter, which provides: ". . . Any amendments to this Charter shall be published by the Council in at least one newspaper of general circulation published in the County for five successive weeks prior to the election at which the question is considered by the voters of the County."
In general, the County's public notices are published on Fridays. Therefore, for the November 4, 2008 election, the public notices of the proposed Charter amendments should have been published on:
 Friday, October 3
 Friday, October 10
 Friday, October 17
 Friday, October 24
 Friday, October 31
Actual public notices were published on:
 Friday, October 17
 Monday, October 20
 Friday, October 24
 Friday, October 31
 Monday, November 3
Each of the published legal notices contained the entire text of both Question "A" and Question "B." Each also contained the entire text of the summary of each Question as it was to appear to voters on the actual ballot. A copy of the legal notice as it appeared on each of the foregoing dates is attached as Exhibit 1, and is incorporated by reference herein.
In addition to publication of the legal notices the following news articles, editorials, and guest comments appeared in the Star-Democrat, the general circulation newspaper serving Talbot County. Copies of these articles are also attached in their entirety:
 1. News story: Compensation Question Placed on Talbot County Ballot, Steve Nery, News Editor, August 14, 2008, with the lead to that story stating, "The Talbot County Council on Tuesday added a question to the *Page 114 
November general election ballot that will ask county residents if they want to authorize the council to establish a commission to set co m pensation for council m embers. . . . The commission would provide a recommended salary to the Council, which could either reduce, approve or deny the recommendation but not increase the amount. The members of the next sitting council would then be paid that salary. According to Section 207 of the Talbot County Charter, council members now receive $14,400 annually, with the council president receiving an additional $1,000. . . ." (Exhibit 2)
 2. Guest Comment: Limiting our Franchise, Joe Secrist[1], October 10, 2008: "There are two proposed amendments to the Talbot County Charter that will appear on the November ballot. Both limit the franchise of Talbot County voters. Consistent with the belief that "the best government is that which governs least," the Republican Central Committee of Talbot County (RCCTC) opposes both proposed amendments to the Charter. Question A: Vacancies in the County Council (Resolution #149 to amend Section 805). The proposed amendment would give authority to the Governor of Maryland to make the appointment of a new Council member if the Council fails to fill a vacancy within the time prescribed by the Charter. The current Charter requires the County Council to fill any vacancies within 30 days by appointing a new member from a list of three names submitted by the central committee of the party to which the former Council member belonged. . . Question B: County Council Salary Standard Commission. Why do local citizens need a county council appointed commission to set the salaries of county council members? Currently, the salaries of county council members are determined by a charter amendment that appears on the ballot and is decided by popular vote. . . ." (Exhibit 3)
 3. Editorial: On Question A: It's No, Thursday, October 30, 2008: "Question A on the Talbot County election ballots this year asks voters if they support a charter amendment to have the governor fill vacancies on the county council should the council fail to do so itself within 30 days. The answer should be an emphatic "no". . . ." (Exhibit 4)
 4. Editorial: Question B: Vote No, Friday, October 31, 2008: "Talbot County voters will have two ballot questions on Tuesday's general election ballot. Question B would *Page 115 
amend the Talbot County Charter to allow the Talbot County Council to establish a salary commission that would recommend the pay for county council members." This same editorial was published on Sunday, November 2, 2008. (Exhibit 5)
 5. News story: Voters go to polls Tuesday; Cast ballots for president, congressman, local school boards, ballot questions, Steve Nery, News Editor, Monday, November 3, 2008 "Talbot County voters also will be asked two ballot questions concerning the Talbot County Council. Question A asks the voters if they would like to amend the Talbot County Charter concerning vacancies on the county council. The proposed charter amendment would eliminate the council's power to make an appointment after 30 days. At that point, the governor would have 30 days to make the appointment, and failing to do so, a special election would be held. For vacancies occurring more than 60 days before the filing deadline for the primary election for president, any appointment would only be effective until the ensuing presidential election, when a special election would be held. Question B asks voters if they would like to authorize the county council to establish a salary commission. The commission would make recommendations to the council concerning compensation and allowances for the next sitting council. The council could reduce or reject the commission's recommendation, but not increase it. (Exhibit 6)
The result of the referendum was split, broken down as follows[2]:
 Question A

Total votes cast on this question: 18,082
For the Charter Amendment 10,935 60.47%
Against the Charter Amendment 7,147 39.53%
 Question B

Total votes cast on this question 18.023
For the Charter Amendment 8,331 46.22%
Against Charter Amendment 9,692 53.78%
 Analysis: The issue for your consideration is: (1) the validity of voter approval of Question "A," adopting a Charter amendment concerning the process by which vacancies in the Council are each *Page 116 
filled; and, (2) the validity of voter disapproval of Question "B," which proposed to establish a County Council Salary Standard Commission.
Maryland Constitution, Article 11-A § 5 provides, in pertinent part, ". . . The [charter] amendments shall be published by the Mayor of Baltimore or President of the County Council once a week for five successive weeks prior to the election in at least one newspaper published in said City or County."
Separately, Article VIII, Section 805 of the Talbot County Charter, also provides: ". . . Any amendments to this Charter shall be published by the Council in at least one newspaper of general circulation published in the County for five successive weeks prior to the election at which the question is considered by the voters of the County."
Maryland, like the majority elsewhere, holds there is a clearly recognized difference between the effect given to modal provisions of the election laws before an election and the effect of the same provisions after the election. Election officials of course should do what the law tells them to do and, before election, a court will require that they do their duty. Yet, if the election has been held before court action is sought and it is not shown that the failure of the officials to follow the law has interfered with the full and fair expression of the will of the voters, that expressed choice will not be disturbed by the Courts.Wilkinson v. McGill, 192 Md. 387, 393, 64 A.2d 266; Graham v. Wellington,121 Md. 656, 661, 89 A. 232; Seyboldt v. Town of Mt. Ranier, 130 Md. 69,73, 99 A. 960; Carr v. Town of Hyattsville, 115 Md. 545, 549-550,81 A. 8.
In Carr v. Hyattsville, 115 Md. 545, 81 Atl. 8, the Court stated:
 "It is not alleged that the voters were deceived, misled, or confused by the form of the ballot as actually prepared. Nor is there any charge of fraud against the voters or election officers. Nor is it claimed that the result of the election as declared by the mayor and common council was not correct. `In general, those statutory provisions which fix the day and the place of the election and the qualification of the voters are substantial and mandatory, while those which relate to the mode of procedure in the election, and to the record and return of the results are formal and directory. The rules prescribed by the law for conducting an election are designed chiefly to afford an opportunity for the free and fair exercise of the elective franchise, to prevent illegal votes, and to ascertain with certainty the result. Generally such rules are directory, *Page 117 
and not mandatory, and a departure from the mode prescribed will not vitiate an election, if the irregularities do not deprive any legal voter of his vote, or admit an illegal vote, or cast an uncertainty on the result, and have not been occasioned by the agency of a party seeking to derive a benefit from them.' The plain purpose of the Legislature was that this act should become effective if approved by a majority of the voters of the special election, and the object of providing the form of ballot was to ascertain the will of the majority of the voters on the question of its approval, and since that majority did approve the act under the form of ballot used, which was substantially, but not strictly, in the words provided in the act, the will of the majority should not be set aside for any of the reasons stated in the bill. The voters undoubtedly knew they were voting upon the question of the approval or disapproval of the act, and having settled that question at a fair election the object which the Legislature had in view has been gratified, and the act should be held to be in full force and effect. This conclusion is supported by what appears to be the great weight of authority in the American courts."
The latest statement of the rule in this Court was in Lexington ParkVolunteer Fire Department v. Robidoux, 218 Md. 195, 200, 146 A.2d 184,186: `It is generally held that an election which has been honestly and fairly conducted will not be vitiated by mere failure to follow the statute precisely unless the result is shown to have been affected or the statute expressly states that such failure renders the election void. After the election is held, statutes giving direction as to the mode and manner of conducting it are generally construed as directory, unless the deviation from the prescribed forms of the law had so vital an influence as probably to have prevented a free and full expression of the popular will. The courts reason that it would be unjustifiable to defeat the expressed will of the electorate if the irregularity did not frustrate or tend to prevent a free expression of the electors' intention or otherwise mislead them.' Dutton v. Tawes, 225 Md. 484, 171 A.2d 688 (1961).
There is a clearly recognized difference between the interpretation given to provisions of the election laws before election and the construction of these same provisions after election. The election officials are required to do what the law tells them to do and this can be enforced by appropriate court action, Munsell v. Hennegan,182 Md. 15, 27, 31 A.2d 640, 146 A.L.R. 660, but when an election has been held and it is not shown that the failure of the officials to observe the requirements of the law has interfered with *Page 118 
the fair expression of the will of the voters, courts have generally held that the result of the election will not be disturbed. The reason for this is that unimportant mistakes made by election officials should not be allowed to thwart the will of the people freely expressed at the ballot box. . . " Wilkinson v. McGill, 192 Md. 387, 393, 64 A.2d 266
(1949).
Conclusion: There is nothing to indicate that the full and fair expression of the will of the voters was interfered with in the referendum held November 4, 2008 on proposed Questions "A" and "B." The legal notices as published included the exact language of both proposals, including a separate summary as it was to appear on the ballot concerning each question. Formal legal notices as to both questions were published the required number of times (5), although not for the full 5 weeks before the referendum. In addition, there were no less than 6 major news stories, editorials, and guest comments in the Star-Democrat, a newspaper of general circulation in Talbot County.
As noted, the results of the referendum were split between the two questions. The voters approved the amendment proposed by Question "A" to amend the process by which vacancies in the Council are to be filled, and disapproved the amendment proposed by Question "B" to establish a County Council Salary Standard Commission. This split in voting results supports and underscores the conclusion that the voters considered each proposed Charter Amendment separately, understood what each proposed, and separately decided whether to approve or disapprove each of them.
For these reasons, the County believes that the Court would not disturb the results of the referendum as to both Question A and Question B.
Would you please review this matter and provide your opinion concerning whether the 2008 general election referendum results concerning approval of Question A and disapproval of Question B are or are not valid. Thank you for your attention.
[1] Joe Secrist, of Easton, is a member of the Talbot County Republican Central Committee.
[2] A copy of the official election results is attached as Exhibit7. *Page 119