[File No. 6878.]

STATE OF NORTH DAKOTA EX REL. R. H. ANDREWS, Appellant, v. INGVALD P. QUAM, as the County Auditor of Nelson County, North Dakota, and J. R. Tangen, as Sheriff of Nelson County, North Dakota, and Thomas Hall, as the Secretary of State of the State of North Dakota, Respondents.

(7 NW(2d) 738.)

Opinion filed January 18, 1943.

*Alvin C. Strutz,* Attorney General, and *William R. Pearce.* Assistant Attorney General, for appellant.

*Einar Johnson,* State's Attorney, and *Burlness & Shaft,* for respondents.

BURR, J. This matter came to a head while the legislative assembly was in session and the appeal was heard at once owing to the importance of determining forthwith the issues involved. Shortly after the hearing we announced the principles which control the judiciary in controversies of this kind, and stated that in obedience to the constitutional mandate to this court, set forth in § 101 of the Constitution, the reasons for our decision would be given in writing at the earliest opportunity and filed with the clerk to be preserved with the record of the case.

On December 17, 1942, the governor of the state issued a writ of election to fill a vacancy in the House of Representatives and required the election to be held on January 14, 1943.

The relator seeks to enjoin the executive officers from performing their duties, and alleges, among other things: "That the action of the governor of the State of North Dakota in fixing the date of such special election for January 14, 1943, pursuant to a writ of election mailed to the defendant sheriff on December 18, 1942, and reaching him on December 19, 1942, so that the only day allowed for filing petitions for nomination was the same day the said sheriff received the said writ of election, was so unreasonable, arbitrary and unfair as to render said proceedings void and of no effect, and your relator is thereby entitled to a writ of this court enjoining the holding of such special election pursuant to such proceedings."

There are other allegations in the complaint to the effect that the relator had intended to be a candidate and had not been given sufficient time to file a petition for nomination; that the notice of the election was not published in the manner and for the time required in accordance with the law; and that if the defendants are permitted to do what they are doing and intend to do it will be "to the great and irreparable injury of your relator. . . ."

In his brief relator lays the greatest stress on his point that under the laws governing notice of election sufficient time was not allowed for publication of the notice of the time of election; and his argument

was confined largely to this phase. On the other hand respondents assert the law dealing with the time of notice of election does not apply to such a special election as this one involved, and in any event that there was substantial compliance therewith.

Although it was urged on the argument that the relator seeks merely to restrain ministerial actions on the part of the county auditor and other executive officers such as the furnishing of ballots, the recording of election returns and the issuance of a certificate of election, it is immaterial what the action may be called for the result would be the enjoining of the election. The relator prays this court 'that "all proceedings leading up to and connected with a special election to be held on January 14, 1943, be adjudged null and void." It is clear therefore that the result sought is to enjoin the holding of the election and this is the purpose of the proceeding. Hence, in view of the principles underlying the issue involved it is not necessary to dwell on these side issues. The trial court denied an injunction and the relator appeals.

The basic, the fundamental proposition involved is the jurisdiction of the courts in matters of this kind and the determination of this disposes of the controversy.

Section 44 of the Constitution provides: "The governor shall issue writs of election to fill such vacancies as may occur in either house of the legislative assembly."

According to the underlying political theory set forth in our state Constitution governmental powers are assigned to three great departments—the legislative, the executive and the judicial. Under the provisions of § 71 of the Constitution the executive power of the state is vested in the governor. Among the powers granted to and the duties imposed upon the governor under the Constitution, is that of issuing a writ of election to fill a vacancy which may exist in either house of the legislative assembly. This power is vested solely in the governor and neither of the other departments may interfere with him in this respect. This principle underlying the exercise of such an executive power seems never to have been challenged. It manifests itself in different ways, depending upon the constitutional power exercised by the executive. In 1791 President Washington made use of the power conferred upon the President by § 3, Art. 2 of the Constitution of the United

States to convene either House of Congress on an "extraordinary occasion." Thus he convened the Senate without in any manner disclosing what was the "extraordinary occasion." He did so on at least three subsequent occasions, and since his day at least nine other presidents have done the same thing. In 1898 the governor of Kansas followed the same rule, under the same circumstances, and in Farrelly v. Cole, 60 Kan 356, 56 P 492, 44 LRA 464, the court held that such question is to be determined by the governor alone and is not subject to challenge or review by the courts. Hence when, in the case at bar, the governor exercised such executive power as is involved herein the election was called by authority of law.

. It is important to bear this in mind in order to avoid confusion with questions which have been before the courts in matters where it was claimed the election to be held had no authority of law for its basis; and also to keep in mind that this matter before us is an election dealing only with filling a vacancy in one of the houses of the legislative assembly.

This election called is based upon the constitutional grant of power given to the governor requiring him to issue a writ of election and in such a proceeding as this its exercise cannot be challenged by either of the other departments of government.

' In the broadest sense of the term the question involved deals with the theory of government adopted by our state. To grant a writ of injunction would not only restrain the officers mentioned but would in effect restrain the voters themselves for it would prevent the electors in the district affected from exercising their choice. The language used by the supreme court of Illinois in Walton v. Develing, 61 Ill 201, though used in a different type of election, is peculiarly appropriate here. The court said:

' ."The election proposed would have been an assemblage of the people for a lawful purpose, and for consultation for the common good. . . . The attempt to check the free expression of opinion—to forbid the peaceable assemblage of the people—to obstruct the freedom of elections—if successful, would result in the overthrow of all liberty regulated by law. . . . If the courts can dictate to the officers of the people that they shall not hold an election from fear of some imaginary

wrong, then people and officers are entirely subservient to the courts, and the consequences are too fearful to contemplate.

"The principle which would authorize the mighty mandate of a court of chancery, in this case, would justify it in every election to be held by the people, and thus the whole administration of the government might be obstructed and all power and authority placed at the footstool of the judge."

By thus quoting an authority we are not assuming that the courts, in the exercise of the judicial power vested in them by the Constitution, will not issue writs of injunction or mandamus in matters of purely ministerial character, or where there is no authority of law for the election, or even in cases which involve the expenditures of funds other than the costs of the election. The record shows that the courts have been vigilant in the exercise of the judicial power to further the exercise of the elective franchise by compelling the performance of certain ministerial duties or enjoining the doing of actions under the guise of ministerial duties. See State ex rel. Linde v. Hall, 35 ND 34, 159 NW 281; State ex rel. Burtness v. Hall, 37 ND 259, 163 NW 1055; Dyer v. Hall, 51 ND 391, 199 NW 754; Schumacher v. Byrne, 61 ND 221, 237 NW 741; Preckel v. Byrne, 62 ND 356, 243 NW 823.

But the question involved here is that of preventing an election called by constitutional authority for a constitutional purpose and for the exercise of the inherent right of the citizens of the state and specifically the right of the electors in the legislative district affected.

The courts will not enjoin the holding of elections called by proper authority for the purpose of carrying on the governmental system of our state, or as many courts term it, elections for purely political purposes—using this term "political" in its highest sense. This is so well established that little authority need be cited. The supreme court of Alabama in Wilkinson v. Henry, 221 Ala 254, 128 So 362, 70 ALR 712, quotes with approval this observation of Professor Pomeroy, in his work on Equity Jurisprudence: "An injunction will not issue, as a general rule, for the purpose of restraining the holding of an election, or directing or controlling the mode in which, or determining the rules of law in pursuance of which, an election shall be held. An

election is a political matter, with which courts of equity have nothing to do. Moreover, the effect of interference in such matters might often result in the destruction of the government. This is especially so when the relief is sought to prevent the holding of an election. The attempt to check the free expression of opinion—to forbid the peaceable assemblage of the people—to obstruct freedom of elections if successful, would result in the overthrow of all liberty regulated by law. The mere effort to assume such power is dangerous to the rights of the citizen."

See also McAlister v. State, 95 Okla 200, 219 P 134, 33 ALR 1370. The extensive notes found in 33 ALR 1376 and 70 ALR 733, bear out this principle. See also 18 Am Jur 254, Elections.

That this guiding principle is not peculiar to this state or to the other states of the United States is illustrated by the provincial decisions in the Dominion of Canada. In this Dominion the provinces correspond to the states, the governor general to the President and the lieutenant governor of the provinces to the governor of the states although the appointments to office and the powers differ, and also the charters of the Dominion of Canada and of various provinces are documents somewhat different from our Constitutions. But the tripartite system of government is followed in principle and in Redman v. Buchanan, 7 Alberta LR 35, 11 DLR 389, we find an issue determined very similar to the one at bar. In Alberta the lieutenant governor of the province, acting in the same capacity as the governor of this state, had the power to issue an election writ calling for nomination and election of members of the legislature and exercised the power. An elector "suing on behalf of himself and all the other electors of the district," applied to the court for an order restraining the defendant, the returning officer, "from holding such nomination and election" on the ground that a sufficient length of time had not been allowed for nomination and election. The court found that the time allowed was not in accordance with the statutes but nevertheless held that the court had no jurisdiction to enjoin the defendants "from acting under this writ" as the courts could not "exercise jurisdiction over matters pertaining to elections to the legislature of this province." The court held that so long as the governor failed to recall the writ the executive officers

acting under him were doing what they were commanded to do, and not only were they entitled to do so but they were bound to obey the writ. The judge writing the opinion says, "I know of no authority in this Court to set aside such a writ as this," and in support of his opinion cites decisions from the supreme court of the Northwest Territories and the Chancellor of Ontario, particularly McLeod v. Noble, 28 Ont Rep 528.

Relator argued strenuously that the governor, in fixing the date for the election, did not allow sufficient time to give the notice of election required by law; and the suggestion was made that if the courts in exercise of the judicial power did not step in to prevent such an election as the one contemplated it might sow the seeds of arbitrary executive power.

We do not pass on this proposition. We have already applied this principle of noninterference to the acts of the legislature. In Cuthbert v. Smutz, 68 ND 575, 282 NW 494, it was urged that the legislature had placed false declarations on its record, that the legislative declaration involved was wholly without foundation, was false in fact and was made for the sole "purpose of preventing the free exercise of the referendum . . . and with the view of frustrating the referendum provisions of the Constitution of North Dakota." We held therein whether false or otherwise it is not for the judicial department to interfere with the legislative.

Again, if the claim should be made that the legislature of a state enacted legislation after the expiration of the period provided by the state constitution for the life of the session and that these journals were so written as to show otherwise, that is, to show legislation was enacted within the period fixed by the Constitution could it be seriously contended the courts could go behind the record to investigate the truth of the claim?

The United States Supreme Court has recognized this same principle and in the case of Luther v. Borden, 7 How (US) 1, 12 L ed 581, held that these so-called political questions are entirely outside of the jurisdiction of the judiciary. This case involved the question of the contending governments in Rhode Island and which was the real government. The court said this was a matter to be decided by the execu-

tive department alone. In this decision quoted the court said: "The high power has been conferred on this court of passing judgment upon the acts of the state sovereignties, and of the legislative and executive branches of the Federal government, and of determining whether they are beyond the limits of power marked out for them respectively by the Constitution of the United States. This tribunal, therefore, should be the last to overstep the boundaries which limit its own jurisdiction. And while it should always be ready to meet any question confided to it by the Constitution, it is equally its duty not to pass beyond its appropriate sphere of action, and to take care not to involve itself in discussions which properly belong to other forums." 7 How (US) 47, 12 L ed 601. Again in Taylor v. Beckham, 178 US 548, 44 L ed 1187, 20 S Ct 890, 1009, the Supreme Court of the United States quotes with approval this same doctrine.

It may be of interest to note that in this former case the famous constitutional lawyer, Daniel Webster, gave to the court the benefit of his erudition and of his thorough understanding of the American system of government.

The members of our constitutional convention were perfectly aware of the possibility of conflict under the tripartite system in vogue in this and all liberty-loving countries. There is always the possibility of conflict caused by the overlapping of functions. Counsel for relator makes no claim of arbitrariness or bad motives, in fact freely disclaims any such suggestion, but points out that a governor of the state, in issuing a writ of election to fill vacancies in either house, might so act as in effect to prevent the utmost freedom of expression of opinion on the part of the electors affected. Such possibility however is avoided under our Constitution. While the determination of whether he will issue a writ of election is solely within the power of the governor, and a failure to issue may interfere temporarily with representation of a certain portion of the state, nevertheless it can be only for a short period for it is only in a case of vacancy such power exists, and the expiration of the term sets in motion the other constitutional provisions providing for the election of representatives. On the other hand if it be argued that the writ of election did not give sufficient time for expression of

opinion the remedy is with the very body affected—the house of representatives in this case.

Section 47 of the Constitution provides: "Each house shall be the judge of the election returns and qualifications of its own members." In State ex rel. Schmeding v. District Ct. 67 ND 196, 271 NW 137, this court was required to interpret the provisions of this section 47 of the Constitution. Therein we held this constitutional provision means that each house is the sole judge. Neither house, nor the two houses together, can abridge the power vested in each house separately to make a final decision as to the qualifications of one of its members. Hence our Constitution very wisely prevents the foisting of an illegally elected member on either house of the legislative assembly. This court, in the case cited, disclaimed any authority to control the decision of the legislative department, as we here disclaim any such authority to control the executive department or the election which was called by the governor in pursuance of the powers vested in him by the Constitution. The lower court was right in refusing to grant the injunction and therefore the dedcision is affirmed.

MORRIS, Ch. J., and BURKE, NUESSLE, and CHRISTIANSON, JJ., concur.