Breitel, J.
The successful candidate for District Leader (Male) Part B of the 22nd Assembly District, Democratic party, in the County of Queens, appeals from an order directing a new primary election in a proceeding brought by the unsuccessful candidate under section 330 of the Election Law. Special Term, after a hearing, granted such order, and the Appellate Division affirmed by a divided vote.
The statute provides that the court may direct a new election where it “ has been characterized by such frauds or irregularities as to render impossible a determination as to who rightfully was * * * elected” (Election Law, § 330, subd. 2). This is the statutory standard and it is stated in the alternative, namely, that frauds or irregularities may ground a court’s discretion in directing a new election.
In the instant primary a total vote of 2,827 was cast, 1,422 for the winner and 1,405 for the loser. Thus the winning margin was a mere 17 votes. Coneededly 101 possible votes in the aggregate number were suspect or invalid for some kind of irregularity without any evidence of fraud or intentional misconduct. According to the public counter on the machine, there were 68 more votes cast than there were qualified persons who signed the voter registration (buff) cards. To be sure, it may be that the public counter did not register actual votes but only openings and closings of the automatic voting machines. In any event, such excessive operations were as unlawful as if actual *597 excess votes were cast, and are significant because of the impossibility of knowing, in the absence of positive evidence, whether that is all that happened when the machines were opened and closed. There were 19 suspect or invalid votes because of blank, void, or missing party enrollments, 7 voter registration cards that were not signed, one irregular card, and 6 signings-in by members of the Conservative party although there was no contested Conservative primary. These make up the total of 101 suspect or invalid votes.
It is evident that even a small portion of the suspect votes could undo the slight margin of the victor and change defeat into victory for the loser. Hence, the statutory standard is met precisely, justifying the lower court’s exercise of discretion in directing a new primary election. On almost identical facts, this court affirmed a similar direction (Matter of Nodar v. Power, 18 N Y 2d 697). In the Nodar case, 1,417 votes were cast for the contested position, 722 for the victor and 695 for the loser. There were 109 invalid or suspect votes, consisting of votes by 80 persons who were not enrolled and who signed in, and 29 excess operations of the machiné according to the public counter. There, a victory margin of 27, when weighed against 109 irregular votes, was sufficient to require a new election without evidence of fraud or other intentional misconduct. Matter of Acevedo v. Power (18 N Y 2d 700) and Matter of O’Connor v. Power (18 N Y 2d 705), decided the same day as the Nodar case, reached an opposite conclusion. These were affirmances of exercises of discretion by the lower courts in declining to direct new elections, and were supported by entirely different probabilities. In the Acevedo case, there were 103 suspect votes against a victory margin of 95, and, in the other, some 262 suspect votes, of which Special Term refused to invalidate 102, leaving 160 against a victory margin of 165 votes. Obviously, a change in the result would require that the bulk of the questioned votes be shifted to the loser, a gross improbability, or even impossibility, before it could be inferred that the irregularities were influential (see Matter of Badillo v. Santangelo, 15 A D 2d 341).
There evolves from these cases a rational standard: if irregularities are sufficiently large in number to establish the probability that the result would be changed by a shift in, or invalida *598 tion of, the questioned votes, there should be a new election. As stated in the Badillo case (supra) “ An election will not be overturned upon a mere mathematical possibility that the results could have been changed, when the probabilities all combine to repel any such conclusion ” (p. 342); but in cases like the one now before the court, as in the Nodar case (supra), it does not strain the probabilities to assume a likelihood that the questioned votes produced or could produce a change in the result.
While it is troubling to require new election for irregularities without evidence of fraud or other intentional misconduct, ignoring such irregularities would undoubtedly create the likelihood that skillfully manipulated 1 ‘ irregularities ’ ’ would be used to mask corrupt practices. It is better to keep the standards high, even at the cost of penalizing some voters and candidates for the failures of election inspectors, than to increase the opportunities for fraud without possibility or likelihood of discovery. And the statute is explicit in directing that irregularities, as well as fraud, may justify the direction of a new election.
In Matter of Straus v. Power (22 N Y 2d 886), decided September 26, 1968, the significant circumstance warranting a different result is that the respondent successful candidate in that case submitted proof, explaining discrepancies inter alia through the testimony of registered voters who testified to signing in but not voting in the contested primary. Thus the likelihood of the irregularities influencing the result in the election was substantially reduced. Moreover, the margin of victory was much greater than in this case. For all these reasons the lower courts in the Straus case acted entirely within their proper discretion.
In Matter of Jacobowitz v. Power (22 N Y 2d 899) and the two appeals consolidated with it, decided herewith, a different result is also indicated. In these cases, against a plurality of 157 for the victor there were irregularities found below in the amount of 272. However, 60 of those irregularities involved an excess of voters who signed in as against the vote tallied by the public counter. Since there are so many plausible explanations why voters who signed in may not have voted, this discrepancy is without significance. In addition, there were some *599 40 excess votes cast in the Liberal party primary. It is difficult to see, and respondents offer no logical or persuasive support, why this excess should be attributed to any candidate in the Democratic primary. Deducting these 100 votes from the discrepancy of 272 leaves a net discrepancy of only 172, against the plurality of 157. The case then falls within the bounds of the Acevedo and Badillo cases (supra).
On the other hand, in Matter of Mack v. Cocuzzo (22 N Y 2d 901), decided herewith, there was a plurality of 74 votes for the victor and a total of 232 suspect votes. This falls easily within the range of the Nodar case (supra), this case, and the earlier case of Matter of DeSapio v. Koch (14 N Y 2d 735). Moreover, there was the added circumstance that, in at least two of the election districts, the names of the proper candidates in the Democratic primary did not appear on the machines. With a logic that is difficult to fathom, the miscast votes in these two districts were allotted among the candidates whose names should have appeared on the machines.
Accordingly, the order directing a new election should be affirmed.