STATE of North Dakota ex rel. Allen I. OLSON, Governor of the State of North Dakota, Petitioner,

v.

Honorable A.C. BAKKEN, Judge of the District Court, Respondent.

Henry STINNETT, Jeanne Stinnett, Peter Nikle, Don Cooksey, Joanne Cooksey, Donald Harriman, Darlene Harriman, Tom Gest, John Ippoliti, Jerry Waletzko, Jan Kurtyka, and LeRoy Kurtyka, Contestants and Appellees,

v.

Anita HANSEN, County Auditor of Grand Forks County, and the County Canvassing Board of Grand Forks County, Contestees and Appellants.

Civ. Nos. 10362, 10363.

Supreme Court of North Dakota.

Jan. 14, 1983.

Robert O. Wefald, Atty. Gen., argued, and Terry L. Adkins, Asst. Atty. Gen., Bismarck, for petitioner, and contestees and appellants.

A.C. Bakken, Grand Forks, argued, pro se.

Henry H. Howe, Grand Forks, argued, and Mary E. Seaworth, Senior Law Student, argued, for contestants and appellees.

SAND, Justice.

Initially, twelve voters brought an action under the provisions of North Dakota Century Code § 16.1–16–02 against the Grand Forks County Auditor and Grand Forks County Canvassing Board contesting[1] the election held on 2 November 1982 in Winship precinct, Grand Forks, North Dakota. The action was filed with the clerk of the district court pursuant to NDCC § 16.1–16–04. The contestees (Auditor and Canvassing Board) answered and admitted that a ballot label (voting guide booklet) intended for another precinct was erroneously placed in a voting booth of Winship precinct; that ballots (ballot cards) voted in all six voting booths at Winship precinct, including the booth in which the ballot label that did not correspond[2] with the ballot card was used, were placed in the same ballot box and were commingled; and that this error was not discovered until 526 ballots (including absentee ballots) had been deposited in the ballot box.

Sixty-one ballots were cast after the discovery and correction, and were placed in a separate ballot box. The County Canvassing Board met and certified only the 61 votes cast in Winship precinct after the discovery of the error. The board ruled that it was impossible to determine the actual preference or intent of the voters from an examination of the ballots voted from guide books in which the order of listing candidates varied. However, in the final analysis, the only race that had a margin less than 526 votes was for legislative candidates for the House of Representatives from the Forty-second District.

After a hearing, the district court found that the error was of such magnitude that it could have affected the outcome of the election; that it was impossible to determine the actual will or intent of the 526 Winship precinct voters; and "that no one was elected to the race for the second seat in the House of Representatives in District 42 and any election certificate issued to Mike Hamerlik must therefore be annulled and set aside." The court also noted that the last sentence[3] of NDCC § 16.1–16–08(4) was not applicable because the members of the House of Representatives are elected only for a two-year period, pursuant to Art. IV, § 9 of the North Dakota Constitution, without the usual "until his successor is duly elected and qualified," and as a result there was no incumbent. Therefore the remedies provided for in NDCC § 16.1–16–08(4) applied, and the trial court order "pursuant to Section 19, of Article IV, of the North Dakota State Constitution, the Governor shall issue a Writ of Election to

1. The contest pertained principally to the erroneous use of a guidebook not corresponding to the ballot cards, resulting in 526 votes not being counted. It was not the usual contest by a candidate or between candidates.

2. Winship precinct used ballot cards, ballot labels, and punching devices (voting device) to pierce the ballot cards. A ballot card and ballot envelope, as well as a ballot label (a guide containing names, etc.) to be voted were used. The names of the candidates were not properly aligned with the ballot card and ballot label. All of these items are defined in NDCC § 16.1–06–12.

3. The last sentence of NDCC § 16.1–16–08(4) is as follows:

"This subsection shall not apply if an incumbent is in office and is entitled to serve until his successor is duly elected and qualified, in which event the incumbent may only be removed by impeachment."

fill any vacancy." The court also concluded that the election should be limited to the 526 voters whose ballots were not counted and that the voters should be permitted to vote on all issues and that their votes should be added to the official certification of votes by the Grand Forks County Canvassing Board.

The judgment also directed that certified copies of the findings of fact, conclusions of law, order for judgment and judgment be transmitted to the Governor and the Speaker of the House of Representatives for the 48th Legislative Assembly.

In the meantime, a certificate of election was issued to Mike Hamerlik, the legislative candidate whose margin of victory was less than 526 votes, and the House of Representatives had an organizational meeting on 7 December 1982. Thereafter, the State of North Dakota ex rel. Allen I. Olson, Governor, requested this Court to exercise its original jurisdiction and issue an appropriate writ declaring the judgment of the district court void ab initio and such other relief as may be appropriate.

Shortly thereafter, the County Auditor and the Canvassing Board of Grand Forks County, pursuant to NDCC § 16.1–16–09, appealed the judgment of the district court to this Court. This Court, in an effort to expedite the entire matter, directed that both cases be heard at the same time, 7 January 1983.

Both the appeal by the twelve voters and the application to this Court for an appropriate writ involved basically the same issue and, accordingly, we will treat them as wholly consolidated.[4]

The contestees and the State, relying upon Art. IV, § 26, N.D. Const., contended that the trial court was without jurisdiction on the subject matter and as a result its judgment was void. Art. IV, § 26, states:

"Each house shall be the judge of the election returns and qualifications of its own members."

This provision (previously § 47) has been involved in some manner by this Court in a number of instances. *Morgan v. Hatch,* 274 N.W.2d 563 (N.D.1979); *State ex rel. Olson v. Thompson,* 248 N.W.2d 347 (N.D.1976); *State ex rel. Andrews v. Quam,* 72 N.D. 344, 7 N.W.2d 738 (1943); *State ex rel. Schmeding v. District Court of Sixth Judicial District,* 67 N.D. 196, 271 N.W. 137 (1937). In *Morgan,* after referring to the earlier case of *Thompson,* the Court concluded that the constitutional provision did not deprive it of jurisdiction in determining if absentee ballots without an official stamp or initial, in a senatorial contest, should or should not be counted.

Significantly, the United States Constitution has a similar provision found in Art. 1, § 5, which provides:

"Each house shall be the judge of the elections, returns and qualifications of its own members ...."

The United States constitutional provision has been construed at least twice by the United States Supreme Court. In *Powell v. McCormack,* 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), the Court held that Art. 1, § 5, is limited to the standing qualifications prescribed in the Constitution and the Court was not deprived of jurisdiction in an expulsion question involving a non-political matter. In *Roudebush v. Hartke,* 405 U.S. 15, 92 S.Ct. 804, 31 L.Ed.2d 1 (1972), the Court held that Art. 1, § 5, did not prohibit the Indiana courts from conducting a recount of the election ballots for the office of United States Senator.

Other state courts, in interpreting a similar constitutional provision, have concluded that each house of the legislature has the final power and authority to judge elections, returns, and qualifications of its own members; however, even though the legislature has the final power, that power does not prevent courts from exercising jurisdiction and entertaining election contests. *State ex rel. Wahl v. Richards,* 44 Del. 566, 64 A.2d 400 (1949) (relief sought under constitutional provision giving Supreme Court

---

4. The *State ex rel. Olson v. Bakken* application for an appropriate writ meets the basic require-ments for this Court to exercise its original jurisdiction.

jurisdiction to issue writ of mandamus to Superior Court was not in conflict with constitutional power given to legislature to determine elections and qualifications of its own members where determination of question was made before the House convened); *State ex rel. Wheeler v. Shelby Circuit Court,* 267 Ind. 265, 369 N.E.2d 933 (1977) (statute permitting courts to participate in recount process was not invasion of legislative prerogative to determine qualifications of its members because neither original vote nor recount were absolutely binding on the legislative body); *Phillips v. Ericson,* 248 Minn. 452, 80 N.W.2d 513 (1957) (statute conferred authority upon district court to hear election contest, subject to final action in the house of legislature involved); *Rice v. Power,* 19 N.Y.2d 106, 278 N.Y.S.2d 361, 224 N.E.2d 865 (N.Y.1967) (courts have power to require that certificate of election reflect an accurate tally of votes cast despite constitutional provision that makes Convention the ultimate judge of elections, returns, and qualifications of members); *Williamson v. State Election Board,* 431 P.2d 352 (Okl.1967), and *Wickersham v. State Election Board,* 357 P.2d 421 (Okl. 1960) (court had constitutional power to enforce election laws of state pertaining to recount notwithstanding provision that each house shall be the judge of elections, returns, and qualifications of its members); *Bailey v. Burns,* 118 R.I..428, 375 A.2d 203 (1977), and *McGann v. Board of Elections,* 85 R.I. 223, 129 A.2d 341 (1957) (jurisdiction of Supreme Court to pass on questions of law in cases brought before it involving elections for senators and representatives to the general assembly was not affected by constitutional provision that each house of the general assembly shall be the judge of the election and qualifications of its members).

We are aware that several courts, in matters relating primarily to qualifications, have held that each house of the legislature has final and exclusive authority to judge its members. *In re McGee,* 36 Cal.2d 592, 226 P.2d 1 (1951); *Lee v. Lancaster,* 262 So.2d 124 (La.App.1972); *Lund ex rel. Wilbur v. Pratt,* 308 A.2d 554 (Me.1973); *Opin-*

*ion of Justices to the Senate,* 375 Mass. 795, 376 N.E.2d 810 (1978); *Combs v. Groener,* 256 Ore. 336, 472 P.2d 281 (1970); *Scott v. Thornton,* 234 S.C. 19, 106 S.E.2d 446 (1959).

The North Dakota Supreme Court, in *State ex rel. Sathre v. Quickstad,* 66 N.D. 689, 268 N.W. 683, 107 A.L.R. 202 (1936), had under consideration a statute providing in part that "the city council shall be the judge of the election and qualifications of its own members." The court held that under this provision the courts were not divested of jurisdiction to inquire into the right of an occupant to hold the office of city alderman.

In addition to the foregoing, NDCC §§ 16.1–16–01 through 16.1–16–09 give the court jurisdiction. See *Leu v. Montgomery,* 31 N.D. 1, 148 N.W. 662 (1914). Furthermore, Art. VI, § 8, of the North Dakota Constitution provides in part that:

> "The district court shall have original jurisdiction of all causes, except as otherwise provided by law . . . . "

▆ In construing constitutional and statutory provisions, we give meaning to every phrase, word and sentence and, if necessary, reconcile conflicting pari materia provisions, if possible. *Rothe v. S–N–Go Stores, Inc.,* 308 N.W.2d 872 (N.D.1981); NDCC §§ 1–02–02 and 1–02–03.

If we were to accept and extend the argument of the contestees and give Art. IV, § 26, an overriding effect, without giving meaningful consideration to Art. VI, § 8, and NDCC Ch. 16.1–16, an undesirable and absurd result would be reached. Every primary and general election involves some legislative candidates. Every challenge of such election per se, as distinguished from a challenge specifically directed to a legislative candidate, will incidentally involve a legislative candidate and, as a result, the house involved would be called upon to resolve the conflict. We know that the legislature is not in session, generally, when the primary or the general elections are held. Consequently, considerable confusion and delay would result. We do not believe the framers of the Constitution remotely had such an intent.

In addition, we must also recognize that the Legislature is not in a position to provide any affirmative equitable remedy. The Legislature could reject the "election" of a legislator which may put into operation certain provisions of the Constitution and statutes resulting in the Governor calling a special election. But other affirmative equitable remedies would not be available.

Significantly, the action commenced by the twelve voters did not contest the election of any legislative candidate specifically (NDCC §§ 16.1–16–10, et seq.). The challenge was to the election process in which 526 votes were not counted. The contest only incidentally involved legislative candidates.

In resolving this issue, we cannot overlook that it involves a basic constitutional question, the right to vote and its importance. See, *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), and *Wesberry v. Sanders,* 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964).

■ Taking into account the foregoing legal principles announced in the cases mentioned earlier, and giving full application to the constitutional and statutory procedures, we conclude that the district court, under Art. VI, § 8, N.D. Const., and NDCC §§ 16.1–16–01 through 16.1–16–09, has jurisdiction over the subject matter brought to it by the twelve voters contesting the election. However, under the provisions of Art. IV, § 26, of the North Dakota Constitution, each house will be the *final* judge on the election of its members. In this respect we believe that the rationale employed by the Minnesota court in *Phillips v. Ericson, supra,* and other cases cited earlier, are persuasive.

We now consider the issue whether or not the court properly acted within the scope of its authority by concluding that, pursuant to the North Dakota Constitution, Art. IV, § 19, the Governor is required to hold a special election. We will also consider whether or not the court could properly direct the holding of an election limited to the 526 voters whose ballots could not be counted. In resolving this issue we take cognizance of the observations made by the United States Supreme Court regarding the right to vote.

"Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society. Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Reynolds v. Sims,* 377 U.S. 533, 561–62, 84 S.Ct. 1362, 1381, 12 L.Ed.2d 506, 527 (1964).

"No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders,* 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481, 492 (1964).

To preserve this right to vote and our representative form of government, each branch of government in its respective role must affirmatively act or react within the laws and vigilantly guard against any action or lack of action by any official which will prevent eligible votes, validly cast, from being counted.

The trial judge obviously was concerned about the 526 votes that were validly cast by eligible voters but were not counted because of an improper use of a ballot label (voting guide booklet). The result was that votes recorded on the ballot card were for candidates other than the one for which the voter had cast the vote. The action of the 12 voters was not directed at any particular candidate, but rather was an action focusing on the error that was committed and requesting that the election process be completed or redone so as to permit the 526 voters whose votes could not be counted to cast their votes. In this respect the completion or reconstruction of the election is not, in the true sense, a special election as that term is employed in NDCC Ch. 16.1–16 and elsewhere in the Code. It is a special election but only in the sense that it is not a regular election.

The contestees argued that the remedy provided by the trial court was not authorized by NDCC Ch. 16.1–16.

However, experience tells us that neither a statute, rule, nor regulation can pragmatically cover every situation that may arise, and as a result the official body required to act or make a decision or fashion a remedy must fill the interstices in accordance with those legal concepts, principles, or objectives which may apply to the situation and that are in harmony and legally compatible with the rule, regulation, or statute. This is the situation in this instance. The Legislature in 1981 enacted a comprehensive set of laws in Ch. 241 (NDCC Ch. 16.1–16) but the precise issue involved here was not specifically covered.

The very heart of our form of government depends upon the legal and moral principle that each valid vote should be counted. In this instance there was no evidence introduced that the voters committed the error, nor was the slightest hint presented that such evidence existed. The voters took the pain, time and effort to vote and should be given an opportunity to cast their vote if, through no fault of their own, the vote, as originally cast, cannot be counted. While the limited remedy provided by the trial court may not be the idealistic remedy because a voter may have changed his or her mind since then and may not cast the vote as before, nevertheless the practical remedy outweighs the penalty of failing to count a vote because of an error by someone other than the voter.

■ The law and equity does not favor disenfranchising voters who have complied with the law when the disenfranchisement occurs merely because of mistake, error, negligence, or misconduct on the part of election officials. *Haggard v. Misko,* 164 Neb. 778, 83 N.W.2d 483 (1957).

In *Larson v. Locken,* 262 N.W.2d 752 (S.D.1978), the court held an election invalid, null and void and affirmed the trial court's order for a new election because, in an election where only 105 votes were cast, and where there was a three-vote difference between candidates, 16 ballots were invalid on their face because the official stamp was not placed on the ballots. The court affirmed the new election rather than have the election decided without counting the absentee ballots. The opinion does not indicate if the absentee ballots could have been identified or why the election was not limited to the absentee voters.

In *Buonanno v. DiStefano,* 430 A.2d 765 (R.I.1981), an obvious malfunction existed in two voting machines which did not accurately record vote totals. A differential of 91 votes existed establishing the probability that the election results would have been effectively different had the machine functioned properly. The court held that the board did not err in holding a new election and limiting it to the polling place in which the malfunctioning machines were located.

■ A new election is a proper remedy as a result of an original election which is encircled with doubt. See *Buonanno v. DiStefano, supra* at 771, and cases cited therein.

■ In this instance the total votes cast for the legislative candidates, which are the only races put in doubt as a result of the failure to count the 526 votes, are as follows:

| | |
|---|---|
| Glenn Pomeroy | 2,332 |
| Benjamin A. Ring | 1,645 |
| Mike Hamerlik | 1,865 |
| Raymond R. Reily | 1,376 |

Concerning the equitable relief courts may provide, the court in *Griffin v. Burns,* 570 F.2d 1065, 1079 (1st Cir.1978), quoted approvingly from *Lemon v. Kurtzman,* 411 U.S. 192, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973), as follows:

"In shaping equity decrees, the trial court is vested with broad discretionary power; appellate review is correspondingly narrow. Moreover, in constitutional adjudication as elsewhere, equitable remedies are a special blend of what is necessary, what is fair, and what is workable."

Courts voiding an election and ordering a new one because of a gross violation of the Constitution are: *Bell v. Southwell,* 376 F.2d 659 (5th Cir.1967); *Coalition for Education in District One v. Board of Elections of the City of New York,* 370 F.Supp. 42 (S.D.N.Y.1974), *aff'md* 495 F.2d 1090 (2d Cir.1974).

In *Akizaki v. Fong,* 51 Hawaii 354, 461 P.2d 221 (1969), nineteen invalid ballots were commingled with valid ballots and counted in an election where a margin of only two votes existed between candidates. The court, under these circumstances, held it was proper to hold a new election.

In *LaCaze v. Johnson,* 310 So.2d 86 (La. 1974), the Louisiana Supreme Court held that the trial court properly annulled an election and ordered a new one where a voting machine malfunctioned and failed to record the votes cast for one candidate, which might have altered the election.

In *Matter of Ippolito v. Power,* 22 N.Y.2d 594, 294 N.Y.S.2d 209, 241 N.E.2d 232 (N.Y. 1968), the court held that if irregularities are sufficiently large in number to establish a probability that the result would be changed, a new election should be held.

In *Foulkes v. Hays,* 85 Wash.2d 629, 537 P.2d 777 (1975), the court held that the neglect of duty on the part of election officials in preserving and safeguarding ballots between canvassing and recount warranted a new election.

Regarding the instant matter, we have reservations that an election contest initiated under the provisions of NDCC §§ 16.1–16–02 through 16.1–16–09 may be converted into a legislative contest as set out in NDCC §§ 16.1–16–10 through 16.1–16–15 without following the procedures outlined in NDCC § 16.1–16–10, et seq.

After a careful analysis of the situation, we conclude that a vacancy, as that term is generally used in our statute, did not actually come about in the instant case. Rath-

er, because of the error, the election process was not completed and, as a result, the legislative office which had a two-year limitation remained unfilled. However, because the canvassing board and the election board certified Hamerlik as elected and he received a certificate of election and no contest was filed against him, he became a de facto member of the House of Representatives and will remain such until the election is completed and all the votes, including the 526 votes, are tabulated. Thereafter, the House of Representatives, as the final judge of the election, may take whatever action it deems appropriate if a contest is filed.

■ Due process and related legal principles of law clearly establish that courts generally do not have jurisdiction over those which are not parties in an action. In this instance, neither the Governor, Hamerlik, nor the entity or board which issued the certificate of election, was a party to the action. Consequently, for this reason alone, the court did not have jurisdiction of the Governor or these parties. In this respect, the conclusions of law and the judgment, in some instances, use language which is merely advisory. We are, however, convinced that the court does not have authority to order the Governor to hold a special election. We have reservations that the court could order the certificate of election furnished to Hamerlik annulled.

We are aware that our court has upheld election board action of voiding or not counting ballots (except absentee ballots counted by canvassing board, *Morgan, supra*) which did not have the official stamp or proper initials where the voter cannot be identified. The contestees argued that the 526 ballots involved should be treated and disposed of in the same manner as ballots without the affixed stamp and initials. However, there is a significant difference between voiding a ballot which pursuant to statute [5] does not contain the official ini-

---

5. Since the *Morgan* decision and prior cases, the North Dakota law has been amended and now, among other things, includes NDCC § 16.1 ·13 22 which, in part, provides:

"The inspector or judge delivering the paper ballot or ballot card, ballot stub, and ballot envelope shall inform each elector that if the ballot is not stamped and initialed by an

tials or stamp compared with the situation in this case where an improper ballot label was used so that the intention of the voter could not be determined but the voters involved could be identified without disclosing for whom they voted.

Taking into account all of these items, and specifically the fundamental constitutional right to vote, we believe the remedy fashioned by the court was proper, in part, and that the court has jurisdiction to direct the county auditor of the precinct involved to conduct a special election limited to the 526 voters who can be identified and whose votes were not counted. To accomplish this the judgment of the court, however, must be modified by eliminating the reference to the Governor calling a special election and the annulment of the certificate of election issued to Hamerlik which will be dependent upon the outcome of the limited election. In addition, the judgment should contain adequate guidelines to the county auditor regarding the limited election to avoid any confusion as to who is entitled to vote.

Accordingly, we remand the case with directions to the trial court to amend the judgment in conformance with this opinion, and as so amended it is affirmed. As a result of the conclusions reached herein it is not necessary to issue an appropriate writ as requested in the application by the State. Neither side is to be taxed costs.

ERICKSTAD, C.J., and PAULSON and VANDE WALLE, JJ., concur.

PEDERSON, Justice, concurring in the results.

I agree entirely with the necessity to remand to permit the judgment to be modified so that it applies only to persons over which the trial court had jurisdiction.

Because there has been no change in the pertinent constitutional provision (except its number which was changed from Article I, § 47 to Article IV, § 26) since our decisions in *Kuhn v. Beede*, 249 N.W.2d 230 (N.D.1976), and *State ex rel. Olson v.*

*Thompson,* 248 N.W.2d 347 (N.D.1976), in my opinion the only role that courts can play in contests of election returns involving the election to the Senate or the House of Representatives is to facilitate the judging which must be done by the particular house involved.

Courts do not have any inherent powers that override Article IV, § 26. As this court said in *State v. District Court of Sixth Judicial Dist.,* 67 N.D. 196, 271 N.W. 137, 143 (1937): "It is well settled that the courts should not assume authority to take any steps in legislative contests unless clearly authorized, and then only to the extent specifically given."

If Anita Hansen can somehow determine the preference of the 526 disenfranchised Winship precinct voters, I think it may very well facilitate the judging that only the House of Representatives must do. It may not be clearly established how this will be done, but if Judge Bakken's suggested methods prove unworkable, he is readily available to consider alternate methods.

The preservation of the right to vote should be given appropriate high priority by all concerned, including the House of Representatives when and if the matter comes before it.

VANDE WALLE, Justice, concurring specially.

I concur in the opinion written by Justice Sand.

This is the first time we have been asked to construe the provisions of Chapter 16.1–16, N.D.C.C., entitled "Contest of Elections," as enacted in 1981. Although some of the provisions of that chapter are similar to previous statutory provisions, now repealed, the statutory scheme does appear to be somewhat different.

The statute clearly provides for recounts in Section 16.1–16–01, and these provisions include recounts in legislative and other elective offices as well as in elections on measures submitted to the voters. The ac-

election official it will be invalidated and to protect his right to vote the elector should

observe the stamping and initialing of the ballot. . . . "

tions with which we are concerned do not involve an election recount. Sections 16.1–16–02 through 16.1–16–09 involve a contest of election in district court by a defeated candidate or ten qualified electors contesting the nomination or election of any person or the approval or rejection of any question or proposition submitted to a vote of the electorate. In this instance twelve electors filed a petition which challenged the election in the precinct, not necessarily the election of Hamerlik to office, although the practical result was that only Hamerlik's election could be affected by the vote in that precinct. Finally, Sections 16.1–16–10 through 16.1–16–17 provide for a legislative contest of election. They require that any person intending to contest the election of a member of the Legislative Assembly shall proceed as therein specified and the contest is to be heard and decided by the Legislative Assembly, not the courts.

Although the practical effect of the election contest involved in the cases before us may indicate that the statutes providing for a legislative contest of election should have been followed rather than the statutes applying to elective offices generally, I agree with Justice Sand that the legal posture of the instant cases indicates the election contest was a challenge to the entire election in the precinct rather than specifically to Hamerlik's right to hold a legislative office. Justice Sand has so characterized the contest and I agree with his conclusion that such action does not limit the twelve petitioners to the legislative contest of election provisions. If, however, the contest of election had been directed only at Hamerlik, I believe the statutory scheme presented in Chapter 16.1–16, which is consistent with Article IV, Section 26, North Dakota Constitution, would require that the challengers pursue their contest in the manner specified for legislative contests rather than in district court.

Although our decision herein may appear to be inconsistent with previous decisions in which we have upheld the voiding of certain election ballots, there is, as Justice Sand has noted, a significant difference between voiding a ballot which does not con-

tain the official initials or stamp pursuant to statute as compared with the situation where the improper ballot label was used so that the intention of the voters could not be determined but the voters involved can be identified without disclosing for whom they voted. That difference is, of course, that "to protect his right to vote the elector should observe the stamping and initialing of the ballot." Sec. 16.1–13–22, N.D.C.C. No such similar statutory right is given to the elector voting in a precinct using an electronic voting system whereby the elector may check the other poll booths in the precinct to determine that the ballot labels used in the various booths in the precinct are identical to the one being used in the booth in which the elector is to cast his ballot.

Although it would be ideal if we could require all of the 526 voters to cast their ballots for the person for whom they voted on November 2, 1982, that is not possible because we cannot compel an elector to disclose how he voted. I believe the procedure specified by Judge Bakken, as modified by the opinion written for the Court by Justice Sand, is the best procedure available to correct the disenfranchisement of the 526 voters in Winship precinct.