Jim **ABBOTT**, Complainant,

v.

**Bernie HUNHOFF, Defendant.**

No. 17981.

Supreme Court of South Dakota.

Original Proceeding

Oct. 14, 1992.

Frank Brady, Steven M. Johnson of Johnson, Miner, Marlow and Reiner, Yankton, for complainant.

Michael D. Ridgway, John R. Kabeiseman of Kabeiseman, Hosmer and Kettering, Yankton, for defendant.

MILLER, Chief Justice.

This original proceeding was brought pursuant to SDCL 12–22–35 to determine an election dispute arising out of the primary election held on June 2, 1992, in Yankton County, South Dakota.

## BACKGROUND

James Abbott (Abbott) and Bernie Hunhoff (Hunhoff) filed nominating petitions in the office of the South Dakota Secretary of State seeking the nomination as the Democratic candidate for South Dakota State Senator, Senate District 18, comprised solely of Yankton County. There was no Republican Primary. Abbott received 1,066 votes and Hunhoff received 1,074. The June 4 official canvass confirmed the results. The Recount Board, however, gave Abbott 1,066 votes and Hunhoff one less, 1,073 votes.[1] The June 29 recount revealed that eighteen registered Republicans and one registered Independent were wrongly allowed to vote in the Democratic Primary.

Abbott alleged that the votes of the nineteen non-Democrats were sufficient to change the outcome of the election. He applied to this Court July 6 to commence an election contest and to fix the procedures to be followed. SDCL 15–25–2. The application was granted July 9, and the Honorable Max A. Gors, Circuit Judge of the Sixth Judicial Circuit, was appointed as referee to conduct appropriate proceedings.

Judge Gors conducted a hearing in Yankton, South Dakota, on July 25. The parties were present and represented by their counsel. The Complainant, Abbott, subpoenaed the nineteen non-Democrats who had voted. Sixteen of them were present at the hearing.[2]

Hunhoff's Answer to the verified Complaint was delivered at the hearing, in open court. Hunhoff contested this Court's jurisdiction to hear the proceeding alleging that the contest was not timely filed under SDCL 12–22–29. The Referee noted the objection and proceeded with the hearing. Upon Abbott's and Hunhoff's voluntary request, the Referee released the sixteen subpoenaed voters who had appeared. No testimony was taken from any of the non-Democrats who had voted and no determination was made of how these voters cast their ballots.

Judge Gors served his Referee's Report and his Findings of Fact on July 29. This Court considered the Referee's Report, together with the parties' objections, adopted the Referee's Findings of Fact, and on August 24, Ordered (Henderson, J., dissenting) the election contest proceedings dismissed wherein it was noted that a written opinion would follow.

## DISCUSSION

■ The official canvass was filed June 4, 1992. This contest was not filed within ten days of that official canvass. SDCL 12–22–29. Nevertheless, a different time period is provided for commencement of a contest after recount.

> Any such contest ... shall not be commenced until after the official canvass of the returns as to the office, *nomination*, position, or question involved; and must be commenced within ten days thereafter, *except that where upon a recount there is a determination that is contrary to the result as pronounced on the official returns*, such contest may be started within five days after such pronouncement of such result of such recount.

SDCL 12–22–5 (emphasis added). The June 29 recount was filed July 2. The result of this recount was contrary to the result as pronounced in the official returns. This contest, filed July 6, was timely filed within five days of the filing of the Certificate of

---

**1.** No ballots were thrown out in the recount. The one vote change in Hunhoff's total was the result of a correction of an error in addition.

**2.** The other three were excused earlier by the Referee.

Recount.[3] Thus, this Court does have jurisdiction.

An election contest challenges the election process itself. *Larson v. Locken*, 262 N.W.2d 752, 753 n. 1 (S.D.1978). The basic question in an election contest is whether the election is a free and fair expression of the will of the voters despite the irregularities. *Id.* at 753. "No person shall be allowed to vote a party ballot at any primary election unless he is registered as a member of that political party in the precinct in which he seeks to vote." SDCL 12–6–26. An essential element of voting in the Democratic Primary is to be a registered Democrat. These nineteen voters, non-Democrats, are disenfranchised by law. *Id.; Cameron v. Babcock*, 63 S.D. 554, 262 N.W. 80 (1935).

The votes of the nineteen non-Democrats were apparently cast primarily due to the gross carelessness of the election officials. There were no claims, nor evidence, of fraud, tampering or intentionally illegal conduct by anyone. Nevertheless, "[a]ny person knowing himself not to be a qualified voter who votes or offers to vote at any election is guilty of a Class 2 misdemeanor." SDCL 12–26–4. These nineteen votes were cast illegally with the result that the votes themselves were illegal.[4]

What then is the effect of the nineteen illegal votes on the election? It is "not the policy of the law to disenfranchise voters because of an election official's mistakes, negligence, or misconduct." *Election Contest as to New Effington*, 462 N.W.2d 185, 190 (S.D.1990); *Larson*, 262 N.W.2d at 754. This Court has previously held that the law in this state is that

unless the party attacking the legality of the votes alleges and proves fraud upon the part of the election officials such as to warrant throwing out the whole vote of the precinct, the burden is upon him to prove for whom the illegal votes were cast; and, if he fails to make such proof, the illegal votes shall be deducted from his vote, unless he satisfies the court that he could not, with the exercise of due diligence, show for whom the illegal votes were cast[.]

*Briggs v. Ghrist*, 28 S.D. 562, 570, 134 N.W. 321, 324 (1912). In other words, if it is possible through the exercise of due diligence to "show for whom the illegal votes were cast, ..." he must show that "but for" the illegal votes he would have prevailed. If he fails to do so, the outcome of the election will stand. The one who would contest the results of an election "assume[s] the burdens of proving, not only the fact that illegal votes were cast, but also as to which side such votes were cast[.]" *Id.*, 28 S.D. at 566, 134 N.W. at 322.

This test was reiterated in *Pawlowski v. Thompson*, 64 S.D. 98, 264 N.W. 723 (1936). This Court stated therein that it was "incumbent upon plaintiff to establish his right to the office, and, failing to do that, he must fail so far as this proceeding is concerned." *Id.*, 64 S.D. at 99, 264 N.W. at 723. The challenger failed to make the showing that "but for" the impropriety of the voting, he would have prevailed and his contest failed. *Pawlowski*, 64 S.D. 98, 264 N.W. 723; *Moreau v. Tonry*, 339 So.2d 3 (La.1976), *appeal dismissed*, 430 U.S. 925, 97 S.Ct. 1541, 51 L.Ed.2d 769 (1977); *Wilkinson v. McGill*, 192 Md. 387, 64 A.2d 266 (1949); *Mehrens v. Election Canvassing Bd.*, 134 Neb. 151, 278 N.W. 252 (1938); *State v. Johnston*, 150 Tex. 174, 238 S.W.2d 957 (1951).

---

3. Finding of Fact 7 of the Honorable Judge Gors contains a typographical error when it states this action was filed on July 8 instead of July 6.

4. As can be seen from these facts, the position of an election official is one of great responsibility. Republican and Independent voters had no business at the polls as there were no Republican Primary contests and Independents cannot vote in political primary elections. In seven of the precincts, illegal votes were cast. Election officials must pay attention to what is going on and the county auditor and state's attorney of each county must insure that the individuals appointed to serve are fully schooled in the conduct of an election and are fully apprised of the importance of their position. SDCL 12–15–7. This whole scenario could have been avoided had the election officials prevented, as is their responsibility, these votes from being cast in the first place.

In *Larson*, 262 N.W.2d 752, an irrigation district election was declared null and void. Violations of the voting statutes, in particular, the absentee voting statutes by the voters themselves, were held to be so numerous and substantial as to cast doubt on whether or not the election represented a "free and fair expression of the will of the voters." *Id.* at 756. This Court felt that to invalidate only the absentee ballots was an inadequate remedy to the severe voting irregularities. It did not reach the question of the "but for" test. The plaintiffs evidently did not do so, but it was noted that "[p]laintiffs could have demonstrated in an appropriate proceeding, that the absentee ballots (all of which were counted) affected the outcome of the election, if that were so." *Id.* at 757 (Porter, J., dissenting).

■ We now address the question of whether it is possible through the exercise of due diligence to "show for whom the illegal votes were cast[.]" *Briggs*, 28 S.D. at 570, 134 N.W. at 324. The constitution of the State of South Dakota reads in part that "[e]ach elector who [is] qualified to vote within a precinct shall be entitled to vote in that precinct[.]" S.D. Const. art. VII, § 2. "The Legislature shall by law ... insure secrecy in voting and provide for the registration of voters[.]" S.D. Const. art. VII, § 3. The constitution provides secrecy in voting only to those electors who are qualified to vote. The constitution does not safeguard the secrecy of the vote of those not qualified to vote. As determined above, the nineteen non-Democrats were not qualified to vote and voted illegally.

■ "Every person has a privilege to refuse to disclose the tenor of his vote at a public election conducted by secret ballot. *This privilege does not apply if the court finds that the vote was cast illegally....*" SDCL 19–13–19 (emphasis added). Therefore, under both the South Dakota Constitution and the laws, the nineteen illegal voters could have been examined as to the tenor of their vote.

As stated by the Texas Court of Civil Appeals, "[w]e do not conceive it to be the law that an elector is entitled to a 'secret ballot' when it is conclusively established that [the elector] is legally entitled to no ballot at all." *Christy v. Oliphint*, 291 S.W.2d 406, 410 (Tex.Ct.App.1956). This Court has previously said that an illegal ("unqualified") voter could be questioned as to how he had voted. *Vallier v. Brakke*, 7 S.D. 343, 347, 64 N.W. 180, 181 (1895). Such a proposition is not unique to this state. *Singletary v. Kelley*, 242 Cal. App.2d 611, 51 Cal.Rptr. 682 (1966); *Hanson v. Villiage of Adrian*, 126 Minn. 298, 148 N.W. 276 (1914); *Wehrung v. Ideal Sch. Dist. No. 10*, 78 N.W.2d 68 (N.D.1956) (recognizing that illegal voters may be compelled to disclose how they voted).

■ Sixteen of the nineteen illegal voters were present when the hearing before the Referee was conducted. The parties agreed, on the record, that none of these illegal voters would be called to testify. At the voluntary request of the parties, the Referee released the sixteen illegal voters. There is no indication of how these nineteen illegal votes were cast, despite the availability of these witnesses. Thus, Complainant has failed to establish by competent evidence, which the exercise of due diligence could have produced, how the nineteen illegal votes were cast and that "but for" the illegal votes he would have won the election.

Proceedings dismissed.

WUEST, SABERS, and AMUNDSON, JJ., concur.

HENDERSON, J., dissents.

HENDERSON, Justice (dissenting).

1. Violates Public Policy.

*The "but for" rule violates public policy and constitutional right to cast secret ballot.*

In *Briggs v. Ghrist*, 28 S.D. 562, 134 N.W. 321 (1912), the plaintiff alleged that the ballots were misread due to excessive markings on numerous ballots. The ballot counters apparently used their best judgment in determining which marks were votes and which marks were extraneous. This Court held that:

Unless the party attacking the legality of the votes alleges and proves fraud upon the part of the election officials such as to warrant throwing out the whole vote of the precinct, the burden is upon him to prove for whom the illegal votes were cast; and, if he fails to make such proof, the illegal votes shall be deducted from his vote, unless he satisfies the court that he could not, with the exercise of due diligence, show for whom the illegal votes were cast[.]

134 N.W. at 324. Applying this "but for" test would, therefore, require the plaintiff to match the specific marked up ballot to the individual voter and then ask the vote counter how the marking was tabulated. If he fails to reconcile the balloting errors, the outcome of the election will stand.

*Briggs* plainly states that "very clear evidence should be furnished as to how one did vote before his vote can be deducted from the total of any candidate." *Id.* 134 N.W. at 322. Thus, if you cannot match the ballot to the voter, the only other method of determining how a person votes is by holding a new election.

In the case at bar, no one knows which ballots were tainted. However, we do know the identity of the individuals who cast the illegal votes. The majority relies on *Briggs*, demanding that Abbott show "for whom the illegal votes were cast ..." to prove "but for" the illegal votes he would have prevailed.

The only avenue for Abbott to meet this burden is to convince the 19 illegal voters to reveal their votes. However, the Constitution of the State of South Dakota states that "The Legislature shall by law ... insure secrecy in voting ..." S.D. Const. art. VII, § 3. Thus, by force of constitutional mandate, the voters do not have to reveal for whom they voted.

On the other hand, South Dakota's rules of evidence, SDCL 19–13–19 provides:

Every person has a privilege to refuse to disclose the tenor of his vote at a public election conducted by secret ballot. This privilege does not apply if the court finds that the vote was cast illegally or determines that the disclosure should be compelled pursuant to the election laws of the state.

This statute may go beyond the bounds of the constitution; but, so far, no court has compelled these 19 people to reveal their votes. In fact, both parties agreed not to inquire. Furthermore, though their votes may have been improperly cast, there was no indication of fraud by these voters. Note the word "fraud" in *Briggs*, 134 N.W. at 324. This lack of mens rea could prevent the use of SDCL 19–13–19.

*Pawlowski v. Thompson*, 64 S.D. 98, 264 N.W. 723 (1936), seems to hold contrary to *Briggs*. At the school district election, election officials determined that ten (10) voters were ineligible. The ballots were discarded and not counted. Then, a new election followed without those ineligible voters. Pawlowski lost 8 to 5. The trial court determined that the ineligible voters were entitled to vote, all ten had voted for Pawlowski, and declared Pawlowski the winner. 264 N.W. at 724. This Court reversed the lower court, holding that elections are decided by the number of legal votes cast and not ascertaining what might have been cast. *Id.* "Where one therefore receives a majority of the legal votes cast, the opposing candidate cannot be declared elected upon evidence that legal voters would have voted for him but were erroneously denied the right." *Id.* Thus, the new election was upheld.

Abbott's situation is the same. He cannot be declared the winner upon evidence that the 19 voters voted against him. "[P]ublic policy forbids that, after it is known just how many votes are necessary to change the result ..." *Pawlowski*, 264 N.W. at 724. Under today's ruling, we are substituting perplexity for precedent.

Following the "but for" rule provides an incentive to cast an illegal vote. Ineligible voters could stuff a ballot box to elect a candidate. Even when the violation is known, as in this case, the losing party is then left with the burden of proving that the illegal votes were not for him. This is an impossible task because the voters have a constitutional right to not reveal their votes.

### 2. New election in contaminated precincts is proper remedy.

In *Larson v. Locken,* 262 N.W.2d 752 (S.D.1978), the election resulted in 105 votes cast with three votes separating the candidates. An investigation revealed that 16 absentee ballots were invalid. This Court held that invalidating only the illegal ballots and determining the election on the remaining ballots "would not be a free and fair expression of the will of the voters" and affirmed the trial court's order for a new election. *Id.* at 756. Here, a new election would resolve doubt.

Both North Dakota and Rhode Island have read *Larson* as holding that a new election is a proper remedy as a result of an election which is encircled with doubt. *State ex rel. Olson v. Bakken,* 329 N.W.2d 575 (N.D.1983); *Buonanno v. DiStefano,* 430 A.2d 765 (R.I.1981). This Court should observe a decision it has previously rendered. North Dakota and Rhode Island respected our 1978 decision.

In *Buonanno,* after a mechanical voting booth had apparently failed to record all votes, the appellate court affirmed a new election, but limited it to the two polling places where the voting discrepancies occurred. The court applied a different "but for" test holding that one cannot determine with absolute certainty what the result of an election would have been "but for" the malfunctioning of a voting machine:

> [T]he contestant should not have to prove that the result would have been in fact different but for the malfunction ... A happy balance is struck by requiring the contestant to show that the irregularities were sufficiently large in number to establish the *probability* that the result would be changed by a shift of or the invalidation of the questioned votes. *Id.* at 770.

A situation almost identical to the one at bar occurred in *Akizaki v. Fong,* 51 Haw. 354, 461 P.2d 221 (1969). Nineteen (19) illegal ballots were commingled with the valid ballots and counted. Same number as here. Although the margin of victory was two (2) votes. The appellate court held that there was "simply no way to determine what the actual result of the election was, and who should therefore be the winner." *Id.* 461 P.2d at 224. The court upheld holding a new election. *Id.*

Other jurisdictions have also held that a new election is the remedy when a cloud of doubt encircles the original results. *Bell v. Southwell,* 376 F.2d 659 (5th Cir.1967); *Coalition for Education in District One v. Board of Education of the City of New York,* 370 F.Supp. 42 (S.D.N.Y.1974), aff'd 495 F.2d 1090 (2d Cir.1974); *Foulkes v. Hays,* 85 Wash.2d 629, 537 P.2d 777 (1975); *Nelson v. Robinson,* 301 So.2d 508 (Fla. App.1974); *Matter of Ippolito v. Power,* 22 N.Y.2d 594, 294 N.Y.S.2d 209, 241 N.E.2d 232 (1968).

Certainly, the process is more efficient by declaring Hunhoff the winner because Abbott could not prove how the illegal votes were cast. However, a new election in the affected precincts is the only just way to allow for a free and fair expression of the will of the voters and eliminate any cloud of doubt. Here, the South Dakota Supreme Court picks the winner. Rather, the people have that right.