310 So.2d 86 (1974)
Jeffrey Dean LaCAZE
v.
Perry M. JOHNSON, Jr., Individually and as Parish Custodian of Voting Machines in and for the Parish of E. Baton Rouge, et al.
No. 55601.
Supreme Court of Louisiana.
November 27, 1974.
Dissenting Opinion December 3, 1974.
*87 Writ denied. There is no error in the judgment of the trial court.
DIXON and CALOGERO, JJ., dissent from the refusal to grant writs for the following reasons: 1. Circumstantial evidence proves to a high degree of certainty that LaCaze received the higher number of votes; 2. There is no precedent in Louisiana for setting aside an election when the irregularity does not permeate the entire election; 3. No precedent has been brought to our attention from other states; 4. No reason has been advanced by any court or litigant why the alternative proposal advanced by applicant (summons the voters from the precinct in question to cast a secret ballot in court) is not the preferable procedure. Additional reasons follow.

ADDITIONAL REASONS
DIXON, Justice (dissenting from the denial of the writ application).
This is an election contest over the general election in the Sixth Congressional District of Louisiana. The majority of this court has denied the writ application of the plaintiff, thus affirming the trial judge's decision calling for a new election.
The undisputed facts, as developed at the trial in this case, show that one voting machine (No. 13067) malfunctioned during the election and failed to record votes cast for Mr. LaCaze. This machine registered 200 votes for Moore and only 9 for LaCaze. However, 353 voters voted in this machine. There are 144 missing votes. Either these votes were cast for LaCaze, or these voters chose not to vote in the congressional race, voting only on some remaining questions on the ballot. The election totals without these 144 votes show that Mr. Moore obtained 60,969 votes and Mr. LaCaze obtained 60,925 votes. Thus, if the missing 144 votes, or any substantial part thereof, can be attributed to LaCaze he will be the winner.
LaCaze shows that there are at least two ways by which this court can determine which candidate received the majority of the votes. The first method simply applies statistical common sense to the returns of the particular precinct in question. There are 144 voters who used machine No. 13067 whose votes were not recorded. These voters either voted for LaCaze or did not vote in this particular race. Analysis of the other machines in this election shows that the highest percentage of voters not voting in this race on any one machine *88 is 7.4%. 98.86% of the voters in the entire election voted in this particular race. Thus it can safely be concluded with a high degree of certainty that over 90% of the 144 unaccounted for votes were cast, but not counted, in this congressional race. Since all of the votes cast for Moore on this machine were recorded, the only conclusion that can be reached is that over 90% of these 144 votes were cast for LaCaze. Including these votes in his total, it is clear that he received a majority of the votes in this election.
Circumstantial evidence is admissible to prove the number of votes cast for the respective candidates. In Dowling v. Orleans Parish Democratic Committee, 235 La. 62, 102 So.2d 755, 762-763 (1958), Chief Justice Fournet, writing for the majority, stated:
"As a general proposition it may be stated that, in the absence of specific facts giving rise to fraud or which cast uncertainty on the result, irregularities in an election will not affect the validity of a nomination or serve to nullify the result...; but the rule is otherwise if a contestant is able to show, upon allegations of specific fraud and irregularities, that but for such fraud and irregularities he would have received a majority of the legal votes cast (Landry v. Ozenne, 194 La. 853, 195 So. 14; Lafargue v. Galloway, 184 La. 707, 167 So. 197); and, as an alternative, it has been recognized that if the Court finds the proven frauds and irregularities are of such a serious nature as to deprive the voters of the free expression of their will, it will decree the nullity of the entire election... Clearly, the elimination of the total votes cast in the specific precinct or precincts wherein irregularities and fraud were found would be tantamount to the disfranchisement of every voter in that precinct and might defeat the will of the people ... the true rule being that the first effort should be to purge the poll by proving for whom the illegal votes were cast, and thus ascertain the real vote; if the true result can be ascertained by eliminating the illegal votes, the election will be upheld.... it follows that where it is possible to separate the illegal votes and show for whom they were cast, they will be deducted from the total of the person for whom they were counted, and the court will give effect to the will of the voters and declare the nominee to be the one who received the most legal votes... Ordinarily ... extrinsic evidence must be employed to determine who the illegal voters were and ascertain how they voted, and circumstantial evidence is competent to prove that fact... and `where the facts and circumstances from which the finding is made are clearly established, and the inference is the only one which can fairly and reasonably be deduced therefrom, the court should not hesitate to act on circumstantial evidence and therefrom find the ultimate fact ...'" (Emphasis added).
Justices McCaleb and Hawthorne, although dissenting in part, specifically agreed that this was the rule of law to be applied, and that there were cases in which circumstantial evidence should be used to show the true outcome of an election. At least six members of this court agreed that circumstantial evidence should be used to determine the true outcome of the election before the court should take the drastic step of annulling the entire election. This rule is clearly supported by common sense and practicality. To hold a new election will cost the State a large sum of money. Each candidate must run another campaign. The voters have legally cast their ballots once. This court can determine the candidate who received the majority of the votes. This person should be declared the winner.
In support of the trial judge's decision annulling this election several cases are *89 cited showing that this court has annulled elections in the past. Hart v. Picou, 147 La. 1017, 86 So. 479 (1920); Payne v. Gentry, 149 La. 707, 90 So. 104 (1921); Hall v. Godchaux, 149 La. 733, 90 So. 145 (1921); Bartmess v. Hendricks, 150 La. 627, 91 So. 68 (1922); Vidrine v. Eldred, 153 La. 779, 96 So. 566 (1923); Dumestre v. Fisher, 195 So. 25 (La.App. Orleans, 1940); State ex rel. Burg v. Folse, 17 So. 2d 32 (La.App.1944); O'Keefe v. Burke, 226 La. 1039, 78 So.2d 165 (1955); Lewis v. Democratic Executive Committee, 232 La. 732, 95 So.2d 292 (1957).
All of these cases are distinguishable from the situation in this case. This court can and should annul elections when the irregularity or illegality permeates the entire election, or when there is an irregularity which makes it impossible to determine which candidate the people lawfully elected. However, where, as in this case, the candidate lawfully elected by the people can be determined, this court should not hesitate to declare him the winner.
There is merit in the alternative demand of the plaintiff. The voting lists show the names of those who voted in this precinct. They can be summonsed to cast another ballot under the supervision of the court. Thus the district court will have the best possible evidence of the number of votes for Moore, for LaCaze, or for no one. No valid reason has been suggested why this procedure cannot be followed.
This was a legal election conducted in substantial compliance with the laws of this State. No authority is cited showing that this court has ever overturned such an election. In this case the will of the people is definitely determinable, either by use of circumstantial evidence or by calling in the voters from the precinct in question to vote again. This court has the power and the means to determine the issues, and should do so.
Accordingly, I respectfully dissent from the denial of this application.