446 So.2d 750 (1983)
Vernell HAYNES
v.
Mary L. WILLIAMS, H.M. "Mike" Cannon, Clerk of Court For the Parish of East Baton Rouge, et al.
No. CE 83 1353.
Court of Appeal of Louisiana, First Circuit.
December 9, 1983.
Curtis A. Calloway, Baton Rouge, for plaintiff-appellant.
Michael R. Wheeler, Steve M. Marks, Kenneth DeJean, Andre LaPlace, Baton Rouge, for defendants-appellees.
Before EDWARDS, PONDER, CARTER, SAVOIE and LANIER, JJ.
*751 CARTER, Judge.
This is an election contest proceeding wherein Vernell Haynes, candidate for the office of Justice of the Peace in Ward 2, District 3, East Baton Rouge Parish, alleges that irregularities and errors, sufficient to affect the outcome of the election, exist in regard to the run-off election held on November 19, 1983. Plaintiff-appellant, Vernell Haynes received an unofficial total of 3,374 votes and defendant-appellee, Mary L. Williams received an unofficial total of 3,379 votes in the November 19, 1983 election, a difference of only five votes. At the trial of plaintiff's suit on November 30, 1983, defendant moved for a directed verdict at the close of plaintiff's case.[1] The motion was granted on December 1, 1983. From the judgment granting defendants' motion for directed verdict, plaintiff appeals.
Plaintiff complains of the following irregularities and/or malfunctions of voting machines in three precincts:
1) At Precinct 2-13A qualified voters were prevented from voting for a candidate for Justice of the Peace because of the misconfiguration (improper lockout) of voting machines;
2) At Precinct 2-13B certain substantial voting irregularities occurred when a voting machine malfunctioned on two occasions; and
3) At Precinct 2-22 qualified voters were denied the right to vote by election officials in violation of LSA-R.S. 18:1432(2) and voting machine malfunction, within the meaning of LSA-R.S. 18:1433, substantially affecting the result of the election.
For purposes of clarity, we will address plaintiff's allegations of election code violations in each of the respective precincts.[2]

ALLEGED VIOLATIONS IN PRECINCT 2-13A
Plaintiff alleges that several of the machines in Precinct 2-13A were improperly configured so that they locked out or prevented qualified voters from casting ballots.
A qualified voter complained to the commissioner-in-charge at approximately 6:05 a.m. that she was unable to cast a vote for justice of the peace because the keys on the machine locked when she attempted to cast a vote for that office. The problem was then corrected, and there is no evidence that it reoccurred. The parties stipulated that (1) three voters, who were qualified to vote for justice of the peace, were unable to vote for that office because of the improper configuration of the voting machines in this precinct, and (2) if they had been allowed to vote, they would have voted for plaintiff.
The record indicates that two additional voters cast ballots prior to this problem being discovered and corrected. However, there is nothing in the record to show that there were any irregularities relative to these two voters.[3]

ALLEGED VIOLATIONS IN PRECINCT 2-13B
The record shows that on the date of the election, machine No. 10914 in Precinct 2-13B developed mechanical problems on two occasions. Shortly after the polls opened, the machine blew a fuse. A technician was called, and the repair was completed by 7:25 a.m. A second problem with the same machine occurred at approximately 8:15 a.m. A technician responded, corrected a *752 problem with the shifter plates, and had the machine back in operation by 10:20 a.m.
Plaintiff alleges that these voting machine malfunctions resulted in substantial voting irregularities affecting the outcome of the election.
The record does not support this allegation. There was no evidence to show that either of these problems resulted in the machine not properly registering the votes cast on it. The commissioner-in-charge, Mr. Donald Ray Williams, testified as follows at pp. 167 & 168 of the record:
"BY MR. WHEELER:
Q. Mr. Williams, you said you had three machines
A. Yes, sir.
Q. at your precinct; did all three machines have the Justice of the Peace on them?
A. Yes, sir.
Q. Was there any voter that was turned away because you were unable to allow them to vote, for any reason?
A. No, sir. See, I was planning on using only two machines because it wasn't that busy of an election, and I was just going to leave one open in case one malfunctioned, which happened. So, I just used the other two and there was plentynobody had to wait in line. There was no line that whole day.
Q. So no one was turned away for any reason?
A. No, sir.
Q. All right.
MR. WHEELER: No further questions.
BY THE COURT:
Q. You have a discretion what machines to use and how many, don't you?
A. Yes, sir. We just more or less do it at random, you know, first person in, I usually take the first machine, and so forth.
Q. And if you have more machines than you need, you can shut one down?
A. Well, we don't actually shut it down. We can only open it and close it when they
Q. Not any of them.
A. we just open it and we don't utilize it all day.
Q. Don't direct voters to that machine.
A. Right. And then at the end of the day we close it and it just has zeros for the totals on that machine.
Q. And with regard to this so-called malfunction, you were told by the mechanic that it did not affect the vote count, only affected the curtain.
A. Right.
Q. And you proceeded to check that out with your own vote and you saw that the protective counter did in fact register a vote.
A. Yes, sir."
Under these uncontroverted facts, plaintiff has not shown that the malfunctions of the voting machine affected the outcome of the election or denied any qualified voter the right to vote. Additionally, it was not shown that any voter was even delayed or inconvenienced in casting a vote at this precinct.

ALLEGED VIOLATIONS IN PRECINCT 2-22
At approximately 7:30 p.m., an electrical power failure occurred at this precinct.[4] *753 Since the voting machines are electrically operated, they could not be used until they had been converted to manual mode. A mechanic was called to convert the voting machines to manual which was completed by approximately 8:30 p.m.
When the power failure occurred, all machines at this precinct were inoperable until converted from electrical to manual. Therefore, no one could vote from about 7:30 p.m. until about 8:30 p.m. During the power outage, several people arrived at the polls while the machines were inoperable. Of the five people who testified that they were either in line when the power went out or arrived during the power outage, several waited almost an hour and then left the polls without voting before the machines were once again operable. Other potential voters drove up to the polling place, saw there were no lights, and left without even getting out of their vehicles. After the machines were converted to manual, an opportunity to vote was offered to all those present who had not already voted.[5] Three commissioners and two voters then cast their ballots.
LSA-R.S. 18:1433 provides as follows:
"Notwithstanding the provisions of R.S. 18:1432, if a discrepancy sufficient to change the result of the election between the total votes cast at an election and the votes counted for the candidates in the election occurs as a result of a voting machine malfunction, and an accurate count of the votes cast on the malfunctioning machine cannot be determined by the offering of circumstantial evidence or any other evidence, the court shall order a revote in the precinct where the voting machine malfunctioned, which shall be limited to those persons listed on the poll list as having cast their ballots in person at the polls in the election in which the machine malfunctioned. Those persons who cast their votes by absentee ballots in that election shall not be eligible to vote in the revote election. The votes cast by absentee ballot in the first election shall be retained, counted, and added to the voting machine totals in the revote election."
Plaintiff alleges that the non-functioning of the voting machines due to the power failure was a malfunction under LSA-R.S. 18:1433. However, there is no discrepancy between the votes cast and the *754 votes counted as a result of the power failure. Additionally, LSA-R.S. 18:1433 refers to actual votes and not potential votes. The five questioned votes were never cast, although the evidence is clear that the voters could have voted had they been willing to wait for the machines to be converted. In this respect, LaCaze v. Johnson, 310 So.2d 86 (La.1974) is clearly distinguishable. In LaCaze, supra, the voting machine failed to record votes which were actually cast.
For the above reasons, LSA-R.S. 18:1433 is inapplicable to the present case.
Plaintiff alleges that because a number of qualified voters, sufficient to affect the outcome of the election, were denied the right to vote by election officials, he is entitled to invoke the remedies provided in LSA-R.S. 18:1432.
Plaintiff contends that qualified voters were denied the right to vote by election officials, in that the commissioners failed to convert the voting machines to manual within a reasonable period of time. Plaintiff contends that except for the power failure and the failure of the election commissioners to properly handle the situation, he would have received additional votes in Precinct 2-22 to have changed the result of the election.
LSA-R.S. 18:1432 provides as follows, in pertinent part:
"If the trial judge in an action contesting an election determines that: (1) it is impossible to determine the result of election, or (2) the number of qualified voters who were denied the right to vote by the election officials was sufficient to change the result in the election, if they had been allowed to vote, or (3) the number of unqualified voters who were allowed to vote by the election officials was sufficient to change the result of the election if they had not been allowed to vote, or (4) a combination of the factors referred to in (2) and (3) herein would have been sufficient to change the result had they not occurred, the judge may render a final judgment declaring the election void and ordering a new primary or general election for all the candidates, or, if the judge determines that the appropriate remedy is the calling of a restricted election, the judge may render a final judgment ordering a new election and specifying the date of the election, the appropriate candidates for the election, and the office or other position for which the election shall be held."
The actions of the commissioners following the power failure were proper and reasonable. They promptly notified a technician who responded to their call as quickly as possible, even though a storm was occurring with lightning, winds, and heavy rains. Furthermore, the procedure whereby a voting machine is converted from electrical to manual is somewhat complex and requires a knowledgeable person to accomplish. If the conversion is not properly done, it can cause serious mechanical problems and malfunctions.
The commissioner-in-charge[6] testified that she told several potential voters that they would be permitted to vote once the machines became operable. There is no evidence that any potential voter was told he would not be allowed to vote after the machines were converted.
Accordingly, we find that the actions of the commissioners were reasonable and proper and that no one at Precinct 2-22 was denied the right to vote by election officials or inoperable voting machines. Furthermore, no other portions of LSA-R.S. 18:1432 are remotely applicable to the instant case.

CONCLUSION
In non-jury cases, the appropriate standard for the trial court's determination of a motion for directed verdict is whether plaintiff has presented sufficient evidence on the case in chief to establish a claim by a preponderance of the evidence. Thomas v. Thom, 408 So.2d 442 (La.App. 1st Cir. 1981), writ denied, 412 So.2d 85 (La.1982).
*755 We conclude that plaintiff has not shown that a number of qualified voters sufficient to change the result of the election were denied the right to vote by election officials, as provided for in LSA-R.S. 18:1432(2), nor has he shown that he is entitled to relief under any other provision of the election code.
Even though a five vote margin in this election was reduced by the stipulation that three qualified voters were denied the right to vote by election officials, plaintiff was required to show that at least two other qualified voters were denied the right to vote by election officials. This he has failed to do.
Plaintiff also alleged that the trial court erred in not allowing the voters, who testified that they presented themselves at Precinct 2-22 but could not vote, to testify how they would have voted. We find it unnecessary to address this assignment because the record is totally devoid of any evidence that these potential voters were denied the right to vote.
Therefore, the judgment of the trial court is affirmed.
AFFIRMED.
PONDER, J., dissents and assigns reasons.
PONDER, Judge, dissenting.
I respectfully dissent believing that the unavailability of a voting machine at 7:30 p.m., just before the polls close at 8:00 p.m., for an hour when it should have taken only a short time to convert from electrical to manual power, is a denial of the right to vote.
I disagree with the majority's conclusion that the conversion from electrical to manual operation was either difficult or dangerous. I think the distinction between a malfunction and a non-function is a tenuous one, and should not be used to affect one's right to vote and have that vote counted.
NOTES
[1] The granting of the directed verdict at the close of plaintiff's case was procedurally correct under LSA-C.C.P. art. 1810(B).
[2] Plaintiff alleged three assignments of error committed by the trial court. We are of the opinion that we have adequately addressed all three assignments in the main body of this opinion.
[3] Precinct 2-13A is a split precinct, in that all persons registered to vote in this precinct are not qualified to vote in the Ward 2, District 3 Justice of the Peace race. The record does not reflect whether these two voters qualified to vote for justice of the peace or, if qualified, whether they desired to cast their ballot for one of the candidates.
[4] Commissioner-in-charge, Mrs. Susan Pearce, testified as follows at pp. 185-188 of the record:

"Q. And now, Mrs. Pearce, you were the Commissioner in Charge at Precinct 2-22 on November 19, 1983. Werewould you tell the Court what happened at that precinct that was out of the ordinary?
A. Well, it had been a long election, all day long. We were watching the clock, getting ready to go home, and I had just looked at the clock because lightning had flashed. It was 7:20, and I said, `Oh, no, the lights are fixing to go out.' So, the electricity went off, and I went back to the back in the office and called the voting machine mechanics and asked them to send someone out because it hadn't it wasn't time for the polls to close and I knew my Commissioners voted in that precinct and they had not yet voted. And, he said, `We will send someone out just as soon as we can. They are on their way.'
Q. Okay. What timeyou said the lightning flashed at about 7:20. What time did you call to reportwhat timelightning flashed at 7:20; what time did the lights go out?
A. They went out, justI had just looked at the clock and the lights flashed and they went off again; so about 7:22 or 7:23 the lights went out again, permanently.
Q. And approximately what time did you report this to the Clerk's Office?
A. About 7:30, because I waited about five minutes, hoping the electricity would come back on.
Q. About 7:30, and the lights were not on that time. Do you know what time the lights came back on?
A. The lights did not come back on. When I left that voting place at 9:00 o'clock, we took the voting machine tabulations with a flashlight.
* * * * * *
Q. This is after the lights went out?
A. Yeah, after the lights went out. It was storming and raining. One man came in carrying an umbrella and sat up on the bleachers and I explained to him that the lights had gone out and that we were getting somebody to come put it on manually. And, the couple that came in, I explained the same thing to them.
Q. They stayed?
A. The couple stayed for a little while and then they left and the man finally left. He justhe wanted to know if he could come downtown and vote.
Q. Did anyone vote on the machine manually, other than the Commissioners?
A. Yes.
Q. That's after they were fixed.
A. Yes.
Q. Of course, no one voted while they were still on electric and before they were converted to manual; no one voted then?
A. No.
Q. But there were some people waiting, mainly the three you mentioned?
A. But those three people did not vote. They were advised that they could vote when the machines werewhen they got fixed.
Q. Was there a line of people?
A. There wasn't a line. My four Commissioners were there, two poll watchers were there, and there was another man present. My husband was there with a flashlight; the Police Department was there."
[5] See footnote 4 supra.
[6] See footnote 4 supra.